The complainant, Joseph Solimine, as the owner and holder of 100 shares of the common capital stock of the defendant A. Hollander Son, Inc., a Delaware corporation (hereinafter termed "American company") brought this accounting suit for the benefit of said company against nine individuals, eight of whom are now directors of the company and one of whom (Herman A. Fenning) was until September, 1938, a director of said company. Drawn into the litigation by several of the charges made in the original bill and certain charges subsequently made in complainant's amended bill of complaint and in the supplemental complaint filed by an intervening stockholder is the Canadian company known as A. Hollander Son, Ltd. That company will hereinafter be referred to either as "Limited" or the "Canadian company."
The total stock issued by the American company and outstanding at the time the bill was filed in this cause amounted to 209,700 shares of common stock held by 1,064 stockholders. *Page 231 
Complainant's 100 shares had been purchased by him at $8-1/8 per share about eleven months before the filing of his bill and his holding constitutes less than one-twentieth of one per cent. of the outstanding stock.
The individual defendants filed their answers denying the wrongdoing alleged against them in complainant's bill, denying further that the corporate defendant had suffered any losses in consequence of any of their acts and alleging affirmatively that the action was not brought in good faith or under the honest belief that the wrongs complained of had in fact been committed. The answers further asserted that the action had been brought for the sole purpose of vexing and harassing the defendant company and its officers and directors. The answers further set up that the defendants had, as directors of said company, always acted with fidelity to their positions of trust. The answer of the American company presented a neutral attitude with respect to the controversy. That answer invited inquiry into the matters of complaint and called upon the complainant to establish the truth of his bill, so that the company itself could have and enjoy for itself and its stockholders the benefits and fruits of such accounting and other relief as the complainant for himself and all other stockholders could rightfully and equitably establish.
After the defendants had answered the bill of complaint, a stockholder owning 100 shares petitioned the court for leave to intervene as a co-complainant and to file supplemental, additional or other pleadings and for an examination of the company's books, records and accounts. Such leave was granted, after which the intervening stockholder filed a supplemental complaint charging the commission of additional wrongs by the directors and officers of the American company. The supplemental complaint contained charges that A. Hollander Son, Ltd., the Canadian company, with knowledge of the wrongdoing alleged against the individual directors of the American company, had accepted and retained the benefits of that wrongdoing, such benefits consisting of the use of "secret processes, recipes, formulae, information and working methods" which, it is charged, were and are the exclusive property of the American company. *Page 232 
The supplemental complaint also made other specific charges of wrongdoing and alleged that as a result of the conduct of the defendants, Limited made, received and retained profits which should be decreed to be the property of the American company. Limited was thereupon added as a party defendant and voluntarily submitted to the jurisdiction of this court by filing an answer denying the allegations of the intervenor's supplemental complaint.
Pursuant to Chancery rule 32, the intervenor applied for an order to compel the American company to furnish him a list of the names and addresses of the stockholders. This application was resisted under the claim that misuse might be made of the list.
Research has disclosed no reported opinion dealing with this rule, although rule 32 has been included within the rules of this court since 1892. It is essential that a complainant in a stockholder's suit comply with its requirements.
The rule apparently was adopted as a result of the case ofEllerman v. Chicago Junction Railways, c., Co., 49 N.J. Eq. 217; 23 Atl. Rep. 287, decided in 1891, and its companion case,Willoughby v. Chicago Junction Railways, c., Co., 50 N.J. Eq. 656; 25 Atl. Rep. 277, decided in 1892. In the latter case the court, in discussing the res judicata effect of a decision in one stockholder's suit upon the rights of other stockholders similarly situated, said (at p. 661):
"The practice has long been recognized of permitting suit to be brought by a few as the representatives of a numerous class, on behalf of themselves and all others of the class, when there is a common interest or a common right which the suit seeks to protect, and against a few as representating a numerous class subject to a common liability which the suit seeks to enforce.Story Eq. Pl. § 97.
"`In most, if not in all, cases of this sort, the decree obtained upon such a bill will ordinarily be held binding upon all other persons standing in the same predicament, the court taking care that sufficient persons are before it, honestly, fairly and fully to ascertain and try the general right in contest.' Story Eq. Pl. § 120." *Page 233 
In the later decision in Goodbody v. Delaney, 80 N.J. Eq. 417,
it was pointed out that the only recourse which a stockholder had when another stockholder had already instituted a representative action in behalf of the corporation was to unite under the invitation of the complainant in aiding the prosecution of the first suit. Rule 32 is the means established for the accomplishment of this purpose.
The practice adopted by the court in the stockholders' derivative suit of Wallen v. Duro-Test Corp. (Chancery Docket 124/54) was followed and an order was entered directing the American company forthwith to furnish and deliver to a designated special master of this court a list containing the names and addresses of the company's stockholders and the master was directed to mail to each stockholder a notice of the pendency, nature and object of the suit in broadest details and of the time and place designated for the final hearing thereof.
Although the notice was sent to 1,064 stockholders, only two, Morton Rosenberg and Joseph Polish, sought and were by order permitted to intervene and file additional pleadings. Rosenberg was the holder of 500 shares purchased by him in December of 1938 and Polish owned 200 shares, 100 of which he bought in April of 1937 and the other 100 in January of 1939. No such pleadings were ever filed by the intervenors, Rosenberg and Polish, although they appeared by counsel at the final hearing and aided complainant in the presentation of his proofs. The stock owned by complainant and the intervenors aggregated 900 shares, or less than one-half of one per cent. of the total outstanding stock. The final hearing occupied sixteen consecutive days. The record, including depositions taken by defendants both in Canada and in New York, covers about 1,600 pages of testimony and more than 2,500 pages of exhibits.
Before presenting the facts upon which the parties have been in contest, it is necessary to dispose of a preliminary question that has arisen with respect to the defendant Albert J. Feldman. It is undisputed that in September of 1938 he became a director of A. Hollander Son, Inc., and was then appointed its secretary but that prior to that time he *Page 234 
had been neither an officer nor a director of the company. All the acts charged against the directors of the company occurred prior to the time when Feldman became a director and officer and no evidence has been offered to show that he in any manner participated in those acts. Clearly no liability can be imposed upon a director of a company for acts committed and completed by his co-directors prior to his coming into office. The bill of complaint should be dismissed against him without reference to the various transactions which are questioned in this suit both by the complainant and the intervening stockholders. There appears no valid reason why in the posture of the proofs at the conclusion of the case he should be retained as a defendant in the cause. There will be a decree dismissing the bill in respect to the defendant Feldman.
The proofs offered in this case by the complainant and by the defendants are virtually uncontroverted. Complainant's case rests substantially upon the testimony of the defendant Michael Hollander and the company's accountant A.H. Puder (both of whom were called by complainant as his witnesses) and upon documentary evidence. None of the proofs offered by the defendants was rebutted or otherwise controverted, except only with respect to the translation of the so-called "Polish Government Bonds," where two experts called by the respective parties differed from each other in their translations of those bonds. That conflict will be later discussed when the Eitingon Schild Fur Corporation transaction is considered.
On the third day of the submission of proofs before me, I informed counsel for both sides that owing to my other court engagements it would not be possible for me to continue sitting after the following day. Counsel desired to continue the examination of witnesses and suggested that a master be appointed to sit for the purpose of receiving the proofs. With the consent of counsel for both sides, I designated a master agreeable to both sides and informed counsel that all objections to testimony would be passed on by me at the conclusion of the case. Thereafter, the master sat until the proofs were all in and all objections to testimony were noted in the record *Page 235 
and reserved for argument before me. Such argument was had and my rulings on objections are contained in a separate memorandum.
It should here also be noted that in the course of the final hearing the defendants objected to evidence offered with respect to a transaction with Eitingon Schild Fur Corporation on the ground that the transaction was not within the scope of the bill of complaint. The proofs were admitted subject to a later amendment to conform the bill of complaint to the proof. This was the course pursued with respect to evidence offered on other transactions not then within the scope of the pleading. In view of the serious charges against the directors, the widest latitude in the matter of evidence was permitted and the defendants consented to this unlimited investigation. The pleadings were thereafter amended.
A statement of the origin and development of the American company is important to an understanding of the issues in this case. That company is engaged in the business of dressing and dyeing furs and pelts. Although organized under the laws of the State of Delaware in 1919 its principal place of business, offices and plants are in the city of Newark. The company's business is essentially that of rendering labor or service to its customers. It receives from those customers the latter's furs or pelts in a raw state and converts the raw skin into a finished product ready for incorporation into fur garments. The company has rarely engaged in merchandising furs, although by its charter it has since 1919 been authorized "to purchase and sell fabrics, skins and furs * * *" and "to deal and trade in goods, wares, merchandise and personal property of any and every class and description and wherever situate * * *."
The business was founded more than fifty years ago by Adolph Hollander, now deceased. In 1895 he was joined therein by his son, Harry Hollander, also now deceased. Thereafter the business was conducted by the two as a partnership under the firm name of "A. Hollander Son." A few years later another son, Michael Hollander — one of the defendants herein — joined the firm. Benjamin W. Hollander, also a son of Adolph, entered the firm in 1903 and Albert *Page 236 
Hollander joined the partnership in 1907. Albert was a son-in-law of Adolph. The partnership business was carried on by Adolph and his three sons and son-in-law from 1907 until 1918, except that the son Harry died in 1914.
In 1918 the father Adolph Hollander withdrew from the firm and his interest therein was absorbed by the remaining partners, Michael, Albert and Benjamin W. Hollander. These three continued as co-partners until June 27th, 1919, when they organized under the laws of Delaware the corporation known as "A. Hollander 
Son, Inc.," the company for whose benefit this suit is brought. All the assets of the co-partnership including its plants, equipment, business and good will were transferred by the three partners to the new company in exchange for its entire capital stock. From 1919 until 1925 the three Hollanders owned substantially all the issued and outstanding stock of the American company. This ownership continued until the consummation of a transaction between them and Merrill, Lynch Co., a firm of New York bankers.
On October 7th, 1925, Michael, Benjamin W. and Albert Hollander entered into a written agreement with the firm of Merrill, Lynch Co., whereby they agreed that within forty days thereafter they would recapitalize the American company so that it would have an authorized, issued and outstanding common stock of 200,000 shares of no par value, which stock would then be fully paid for and non-assessable. By that agreement the Hollanders bound themselves to sell and deliver to Merrill, Lynch Co. and that firm agreed to buy 30,000 shares of such new common stock at $24 per share or a total purchase price of $720,000. The agreement also granted to the purchaser an option to buy all or any part of an additional 20,000 shares of such stock at the same price, such option to be exercisable up to October 7th, 1926. The agreement contained statements showing the financial condition of the company as of August 31st, 1925, and it was agreed that at the time the shares of stock would be delivered to the purchaser the company was to be in as good financial condition and was to have a net worth at least as great as that shown in a proposed balance sheet attached to the agreement *Page 237 
as an exhibit. The agreement further provided that certain securities and property shown on an attached schedule and amounting to approximately $800,000 were not to be included amongst the assets of the recapitalized company but that those securities were to be withdrawn from the corporate ownership. That agreement was carried out. The charter of the Delaware company was amended so as to authorize the issuance of the contemplated 200,000 new shares of common stock of no par value, the whole outstanding stock previously outstanding was surrendered and canceled and in place thereof there were issued to the three Hollanders the 200,000 shares, of which number they sold and delivered 30,000 shares to Merrill, Lynch Co., in accordance with the agreement above referred to. The purchaser also exercised the option for the additional 20,000 shares, so that in all the Hollanders sold and delivered to Merrill, Lynch 
Co., 50,000 shares of the 200,000 share issue, reserving and retaining for themselves the remaining 150,000 shares. The stock of the company was then listed for trading on the New York Curb Exchange and about a year later was transferred for trading purposes to the New York Stock Exchange, where it has since remained a listed security. The 50,000 shares purchased by Merrill, Lynch Co. were in turn sold by that firm to the buying public, such sale being under both a prospectus and an advertisement published by Merrill, Lynch Co., containing the statement that in the first instance the stock had been placed privately and that Merrill, Lynch Co. had purchased the stock in reliance upon the financial statements expressed respectively in the prospectus and in the public advertisement thereof.
Due to the sales made by Merrill, Lynch Co. to the public since 1925 and to sales made since that time by the three Hollanders, the public at the present time owns approximately sixty-five per cent. of the issued and outstanding stock. About 75,000 shares or approximately thirty-five per cent. of the outstanding stock is owned by the three Hollanders and members of their immediate families.
The agreement with Merrill, Lynch Co. provided that the three Hollanders would enter into contracts with the company whereby each of said individuals would agree to *Page 238 
serve the company for a period of five years from January 1st, 1926, in stipulated executive capacities and for stipulated salaries.
The agreement with Merrill, Lynch Co. further contained a provision to the effect that the employment contracts with each of the three Hollanders should provide that during the period of five years from and after January 1st, 1926, the employed Hollander will not engage in or permit his name to be used or employed in any way in any business in the United States ofAmerica competitive with that of the company (A. Hollander 
Son, Inc., the American corporation) either directly or indirectly, through stock ownership or otherwise. Since January 1st, 1926, Michael Hollander has acted continuously as president of the American company, Albert Hollander as its vice-president and Benjamin W. Hollander as its treasurer.
Until 1930 the American company had not directly or indirectly engaged in fur dressing and dyeing outside of the United States of America. In 1930 it for the first time extended its business beyond the United States when it took an eighty-seven and one-half stock interest in a subsidiary company organized and known as A. Hollander Son Societe Anonyme, a French company. Since 1930 the French company has engaged in the business of dressing and dyeing furs in France. In 1937 the American company, through its wholly owned subsidiary, Competent Fur Dressers, Inc. (a Delaware corporation), purchased at a cost of approximately $10,500, all the physical assets, business and good will theretofore owned by Competent Fur Dressers, Inc., of New York, which had for several years done a small amount of business in England. It also appears from the testimony, nowhere contradicted, that the American company has never done any business in the Dominion of Canada and that due to tariff impositions there has never been any competition between the fur dressers and dyers of this country and those operating in Canada. This fact is of considerable importance in connection with the claim made by complainant that the acquisition of a Canadian business by Michael, Albert and Benjamin W. Hollander was an act violative of their duty to the American company. *Page 239 
 I. THE ACQUISITION OF THE CANADIAN BUSINESS.
The amended bill of complaint charges that the defendants Michael Hollander, Benjamin W. Hollander and Albert Hollander as controlling officers and directors of the American company violated their fiduciary obligation in that they failed to disclose to the stockholders of that company an option to purchase the shares of Limited (the Canadian company) for $50,000 granted to them in 1922 by Adolph Hollander, their father, the owner of all of the shares of the Canadian company, and failed to disclose that said option provided that the defendants Michael Hollander, Benjamin W. Hollander and Albert Hollander might purchase said shares of the Canadian company for their own use or for the use of A. Hollander Son, Inc. (the American company); that this was done notwithstanding the fact that the business of the Canadian company was a profitable one and within the proper and legitimate scope of the American company; that in 1927 in violation of their duties as such officers and directors the said defendants, without disclosure to the American company or its directors or stockholders and without affording an opportunity to the American company to exercise said option and thereby acquire the stock of the Canadian company, although the American company was financially able so to do, exercised said option of purchase in their own behalf and for the sole purpose of enriching themselves at the expense of and to the detriment of the American company and its stockholders. Earlier in the amended bill it is charged that the said defendants wrongfully appropriated to themselves the business opportunities, offers and interests which were peculiarly within the scope and purview of the corporate business of the American company and which it was the duty of said defendants to acquire for the American company and that the said defendants wrongfully and fraudulently utilized the assets and funds and employed the facilities and personnel of the American company in the appropriation and development of such business opportunities, offers and interests, to *Page 240 
the detriment of the American company and to the gain and profit of said individual defendants. In essence the charge is, and it is so argued in complainant's briefs, that the opportunity to acquire the Canadian business was one which properly belonged to the American company and was unlawfully usurped by the defendants, Michael, Albert and Benjamin W. Hollander. The defendants answered to the merits and denied the claim of corporate opportunity. The answer is elaborate and it will serve no useful purpose to summarize it here.
The proof developed the following facts concerning the acquisition of the Canadian stock. In 1916 the four partners constituting the then firm of A. Hollander Son decided to venture into the fur dressing and dyeing business in Canada. In December of that year they secured a charter from the Dominion of Canada for a new company to which was given the name A. Hollander Son, Ltd. This corporation preceded in point of time the American company as a corporate entity. The stated object was to carry on in Canada the business of dressing and dyeing all kinds of fur skins. The charter permitted a capital of $100,000 to be evidenced by 1,000 shares of $100 each. The entire authorized capital (excepting one qualifying share to the company's Canadian counsel) was issued to the four Hollanders. Immediately thereafter that company rented a factory in Montreal and engaged as its technical head one George Payeur who had for a number of years been a fur dresser and dyer who had had considerable practical experience with dressing and dyeing formulae, some of which formulae he had himself created or developed and others of which he had received from his father. The Montreal factory was fully equipped by Payeur. No employes were brought up from the city of Newark or from any of the other factories operated by the American partnership. The Canadian employes assembled by Payeur in Canada were broken in by him and trained to process furs according to his own methods. It is also of considerable importance to note that when the Canadian company commenced its operations Payeur's own formulae, which were contained in a formula book, covered almost every kind of *Page 241 
fur. This formula book was in 1917 turned over by Payeur to the Canadian company. Thereafter and for a period of about twenty years and until incapacitated by illness, Payeur was the active superintendent of all the work done in the Montreal factory, that work being done under his personal supervision and in the main under his own formulae. During those twenty years Payeur continued to experiment and his additional developments both in formulae and in method were put into operation in Canada and added to that company's formula books. Those books remained with the company when Payeur was later pensioned.
During the first two years of its operations the Canadian company was fairly successful. In 1918 when the father, Adolph, retired from the American firm of A. Hollander Son he desired to become the sole owner of the Canadian business. Accordingly, that year he bought out the stock interests in the Canadian company of his sons and son-in-law and continued to own all the stock of that company until 1922. During that period of four years he radically changed the character of the business of Limited. He virtually ceased all dressing and dyeing operations and allowed the company to engage almost exclusively in the business of buying and selling furs. The result of this change was disastrous. During those four years the company lost both money and prestige. By 1922 it was nothing but a mere shell, its entire surplus having been dissipated and its invested capital of $100,000 impaired.
With the business in this condition Adolph desired to get out from under and he requested his sons and son-in-law to buy him out. This they were willing to do only upon certain conditions, one of the principal of which was that the purchase price should be placed in trust for the use and benefit of Philip Hollander and Monroe Hollander, grandsons of Adolph (children of the deceased son Harry Hollander, the first partner in the business). Adolph was agreeable to this providing he would personally be secured with an annuity of $100 per week for the remainder of his natural life.
Accordingly an agreement was entered into on December 28th, 1922, between Adolph as the seller and the three Hollanders *Page 242 
as the purchasers. It recites Adolph's desire to give up the management of the Canadian company and to dispose of his stock and his request that his sons and son-in-law take over and manage the business and his desire that later they purchase that business either for themselves or for A. Hollander Son, Inc., or that they sell the same to any other person for the best price obtainable. At this time the American company was owned entirely by Michael, Albert and Benjamin. The agreement then declares that the basic consideration for the making of it is the blood relationship between the parties thereto. Adolph bound himself to transfer forthwith to the three Hollanders the legal title to the Canadian stock and to obtain the resignations of all its officers and directors. In consideration of the transfer of that stock the three Hollanders bound themselves to pay to their father an annuity of $100 a week commencing the first week in January, 1923, and continuing during his lifetime. The agreement then declares that although the legal title to the stock was put into the names of the three Hollanders they should hold that stock in trust for certain uses and purposes, the pertinent one being the following:
"At any time hereafter the parties of the second part (Michael, Albert and Benjamin) may acquire the full legal and equitable title to the said shares of stock by declaring unto the party of the first part (Adolph) that they have set aside and are holding in trust the sum of fifty thousand dollars in lawful money of the United States of America in place and stead of said shares of stock and subject to the trusts and uses hereinafter provided for; and upon making such declaration in writing and delivering the same unto the party of the first part, they shall instantly become the full, legal and equitable owners of the said shares of stock unencumbered the (sic) the trusts herein place (sic) thereon."
Contemplating that the three Hollanders might not desire personally to become the absolute owners of said stock, the agreement provides that they might sell the stock to any other person or they might transfer the stock to the beneficiaries of the trust, Philip and Monroe Hollander, but that such transfer or sale should not abrogate or diminish their liability to pay to Adolph his annuity for life. It further provided that if the three Hollanders should at any time after *Page 243 
1922 decide to become the absolute owners of the Canadian stock, then they should retain the trust fund of $50,000 in their own possession and keep the income thereof as reimbursement in whole or in part for the annuity paid to Adolph but that on the death of Adolph the fund itself should be paid to the beneficiaries Philip and Monroe. It was also provided that if the three Hollanders sell the business to any person for a sum exceeding $50,000, then the excess should be retained by them as their ownmoney. The agreement also recites that Adolph revealed to the three Hollanders the true financial condition of the Canadian company by a statement of its debts and liabilities which latter the three Hollanders bound themselves to pay either personally or through the Canadian company, including in such assumption the guarantees and endorsements made by Adolph personally. This agreement concludes with a statement that the trust thereby created shall be irrevocable.
The agreement of 1922 was performed between the parties. All the stock of the Canadian company was in 1922 transferred to the three Hollanders, each receiving 333-1/3 shares. They became immediately directors and officers of that company and have continued as such ever since. From 1922 to the present time the business of that company has been conducted by a general manager, who in turn is subject to supervision by the three Hollanders. For the period of almost eleven years from January, 1922, until September 27th, 1932 (the date when Adolph Hollander died) the three Hollanders personally paid to their father the stipulated annuity of $100 per week.
Under the new management of the three Hollanders the Canadian company immediately showed improvement in business and profit. The proofs showed this was due to the discontinuance of the merchandising activities of the Canadian company and to confining its business to the dressing and dyeing of skins. In 1923 it showed a net operating profit of about $10,000, in 1924 about $20,000 and in 1925 about $33,000. Not, however, until 1927 did the three Hollanders finally serve upon their father a declaration that they were holding in trust the sum of $50,000 in place and stead of *Page 244 
the shares of the Canadian stock and that by virtue of the agreement of December, 1922, and of said notice full, legal and equitable title to said shares was vested in them. The fact that this notice was not served until 1927 has been made the basis of complainant's charge that the option and opportunity to acquire the Canadian stock came to the three Hollanders in 1927 and at a time when the American company was no longer privately owned by them but was already a publicly owned company. Before dealing with this issue it is necessary to state what occurred with reference to the Canadian option at the time the sale to Merrill, Lynch Co. was negotiated and effectuated in 1925.
The sale of 50,000 shares of the stock of the American company to Merrill, Lynch Co. was predicated upon a certain fiscal condition of the American company, guaranteed by the agreement between the parties to be in effect at the time the sale was to be consummated. Identified assets amounting to approximately $800,000 and shown on a schedule attached to the Merrill, Lynch agreement were to be withdrawn from the company's holdings. The option received by the three Hollanders from their father in 1922, under which option they might acquire the absolute ownership of the Canadian stock, was not an asset shown on the financial statements nor reflected in the price agreed to be paid by the purchaser, the Merrill, Lynch firm. The fact that the Canadian business was not to be included is not left to speculation or inference. The testimony establishes that when the Merrill, Lynch transaction was being negotiated with Mr. Charles Merrill of that firm, Mr. Michael Hollander informed him of the Canadian option, the nature thereof and that the option was held by the three Hollanders personally. Mr. Merrill took the position that he was not interested in any foreign enterprise and that Merrill, Lynch Co. did not want the Canadian business to be included in the deal. Thus the purchaser of the 50,000 shares was fully informed of the fact that the three principal officers of the American company personally held an option agreement under which they could at any time personally acquire the ownership of the Canadian business by acquiring the final and absolute ownership of the *Page 245 
Canadian stock. Whether or not the three Hollanders as sellers and Merrill, Lynch Co. as purchaser might have come to an agreement concerning the additional price for the Canadian business is of no importance in the case. The fact remains that the Canadian business was expressly ruled out of the 1925 Merrill, Lynch transaction. That fact is of importance in establishing disclosure on the part of the three Hollanders to and acquiescence by the purchaser, Merrill, Lynch Co.
Complainant contends that the opportunity to acquire the Canadian business presented itself to the three Hollanders in 1927 when it was embraced by the service of the aforementioned notice upon Adolph Hollander and the opportunity was one that properly belonged to the American company for the following reasons:
(1) That the opportunity was a corporate opportunity because it was related to the same line of business as that in which the American company was engaged and within its reasonable needs for expansion or that the opportunity was one in which that company had an interest or reasonable expectancy.
(2) That the three Hollanders were prohibited from acquiring the Canadian business because by so doing they would injure or hinder the business of the American company.
(3) That the opportunity belonged to the American company because in the acquisition or development of that opportunity the assets and facilities of the American company were employed.
It is claimed by complainant that the three elements above stated need not co-exist and that it is sufficient if any one of them is found to be present. Without recognizing that to be the rule of law, the proofs indicate that none of the three elements exists.
In the case of Loft, Inc., v. Guth (Delaware, 1938),2 Atl. Rep. 2d 225 (at p. 239); affirmed, 5 Atl. Rep.
2d 503, relied upon by complainant, the Chancellor stated the rule of corporate opportunity as follows:
"The defendants state as a proposition of law that `where a business opportunity comes to an officer or director in his *Page 246 
individual capacity rather than in his official capacity as an officer and director, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which the corporation has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it.' The proposition, as stated, is in the main acceptable. In support of it, the defendants cite the cases of Colorado andUtah Coal Co. v. Harris Co., 97 Colo. 309; 49 Pac. Rep. 2d429; Lagarde v. Anniston Lime and Stone Co., 126 Ala. 496;28 So. Rep. 199; Pioneer Oil and Gas Co. v. Anderson, 168 Miss. 334; 151 So. Rep. 161; Railroad Co. v. Stubbs, 77 Me. 594;2 Atl. Rep. 9; Lancaster Loose Leaf Tobacco Co. v. Robinson,199 Ky. 313; 250 S.W. Rep. 997. While these cases support the proposition for which they are cited, they also recognize its converse as equally established. The complainant contends that it is not the proposition but its converse that is applicable under the facts of the instant case. As indicated in Pioneer Oil andGas Co. v. Anderson, supra, cited by the defendants, whether a given case falls within the proposition or within its converse, it is impossible to determine by any hard and fast rule. Each case is classified by its own individual facts.
"An examination of the cases cited by the defendants will disclose that in all of them the fundamental fact of good faith was found in favor of the director or officer who was charged with dereliction. In one or more of them it will also appear that the corporation was unable for one reason or another to acquire the property, or the matter of its acquisition was not of practical but of merely theoretical interest to it, or that the accused officer made no use whatever of his corporation's funds, or that the so-called expectancy which the defendant director embraced was not in the line of the corporation's business."
It is clear from an analysis of the two opinions in the LoftCase, as well as of the numerous authorities cited therein, that a finding of "corporate opportunity" will be denied (a) wherever the fundamental fact of good faith is determined in favor of the director or officer charged with usurping the *Page 247 
corporate opportunity, or (b) where the company is unable to avail itself of the opportunity, or (c) where availing itself of the opportunity is not essential to the company's business,or (d) where the accused fiduciary does not exploit the opportunity by the employment of his company's resources, or
(e) where by embracing the opportunity personally the director or officer is not brought into direct competition with his company and its business. It will be observed that all of the foregoing elements are stated disjunctively and it would therefore seem that the absence of any one of them is sufficient to defeat such claim of corporate opportunity as is made in this case. However, in this case all of these circumstances are absent.
That the opportunity to acquire the Canadian stock came to the three Hollanders in their individual capacity admits of no reasonable dispute. The option agreement of 1922 ran to them personally and was induced mainly, if not solely, by the blood relationship which existed between the grantor of the option and themselves. The agreement so states. Underlying that agreement and permeating all its provisions is the father's desire to secure for himself a life annuity and the sons' desire to create a trust fund for their nephews, his grandsons. Nowhere in the agreement appears any suggestion that the opportunity to buy the Canadian stock was intended for the benefit of the American company. The two references to that company do not indicate any intention on the part of the grantor to furnish to it any right or opportunity. The first reference to Adolph's desire that the stock be acquired by the three Hollanders or their company must be interpreted in the light of the fact that from the viewpoint of a layman the three persons and the company were then, in 1922, one and the same interest. The second reference to the company was merely intended to cover a situation arising if the three Hollanders sold the stock, neither to themselves nor their wholly owned company, but to some third person. The very provision in the agreement enabling the three Hollanders personally to acquire the absolute ownership of the stock by the service of a mere declaration is inconsistent with any notion that by the agreement of 1922 any of the *Page 248 
parties thereto intended to afford to or create for the American company any right with respect to the Canadian holdings. Furthermore, the provision of the agreement whereby the three Hollanders bound themselves to pay to their father a life annuity of $100 a week, and this without regard to the outcome of the Canadian enterprise, and also to pay the Canadian company's liabilities and the guarantees and endorsements of Adolph Hollander personally, is wholly in conflict with the idea that the transaction evidenced by the 1922 agreement was intended for the benefit of the American company. It is doubtful whether an agreement of the character made between Adolph and his sons in 1922 would have been tolerated by any corporation other than one in which the sons were the sole parties in interest. Had that agreement been made by Adolph with the American company at a time when the American company was already a public company, its repudiation might well have been accomplished by any dissatisfied stockholder, for the transaction was improvident. The Canadian company was then in a state of collapse, possessed of no good will and burdened with liabilities. Whether or not rehabilitation could be achieved was uncertain and the venture was one involving the chance of continued and increasing losses. The court therefore concludes from the facts and proofs presented that the option and opportunity presented by the 1922 agreement came to the three Hollanders in their personal and individual capacities. The same result would be reached if the 1922 agreement in express terms ran in favor of the American company, for that company and the three Hollanders were then one and the same interest. Had that been the agreement, it would still have been within the right of the individual Hollanders at any time before other stockholding interests appeared in the company to have withdrawn and eliminated the Canadian business as a corporate asset, even as in connection with the Merrill, Lynch transaction there were withdrawn and eliminated $800,000 of corporate securities and properties.
Complainants insist that the opportunity to acquire the Canadian stock must be regarded as having presented itself in 1927, when, as they claim, it was embraced by the option *Page 249 
then being exercised. The reason for this position is very apparent, for in 1922, when the option agreement was secured, there could be no possible conflict on the part of the three Hollanders between self-interest and duty to the American company. They and their company were one and the same. However, by 1927 other interests had arisen through the sale of the stock to Merrill, Lynch Co. and by them to the public.
In the Loft Case, it was contended that the right of Guth (Loft's president) to appropriate a certain business opportunity for himself depended upon circumstances present when the opportunity arose, and this without regard to events subsequently occurring. The Supreme Court of Delaware so held, saying:
"Leaving aside the manner of the offer of the opportunity, certain other matters are to be considered in determining whether the opportunity, in the circumstances, belonged to Loft; and in this we agree that Guth's right to appropriate the Pepsi-Cola opportunity to himself depends upon the circumstances existing at the time it presented itself to him without regard to subsequent events, and that due weight should be given to character of the opportunity which Megargel envisioned and brought to Guth's door."
Complainants argue that the effect of the agreement of 1922 was to present to the three Hollanders the opportunity to acquire the Canadian stock "every day, every hour, every moment of the time between 1922 and 1927" and that "the moment at which Michael Hollander, Benjamin Hollander and Albert Hollander exercised the option and took unto themselves A. Hollander Son, Ltd., was as much a moment of presentment of the opportunity to them as was the moment when Adolph Hollander gave them the option in 1922." They argue, further, that if in 1922 Adolph had made an offer which the three Hollanders turned down and then in 1927 renewed the offer, its acceptance then by the individuals would constitute a breach of fiduciary duty. The difficulty with this argument is that it overlooks the actual facts. The option furnished by the 1922 agreement and the trusts thereby created were irrevocable not alone by force of law but by the expressed intention of the parties. That option was in *Page 250 
itself a species of property which became irrevocably vested in the three Hollanders in 1922, the continuing consideration for which they paid weekly to Adolph. The formal notice served in 1927 was merely the next logical step in the transaction and was but a continuation of the 1922 transaction and in furtherance of it. The notice operated only to convert the trust res from Canadian stock to a fixed sum of money. The argument that the 1922 irrevocable option was self-renewing each day and each hour and therefore constituted a new option in 1927 is not, therefore, tenable. It was the 1922 option alone that was involved in the 1927 notice. In the Loft Case the company's president, Guth, embraced an opportunity presented to him for the first time in 1931, when he was president of the Loft Corporation. In the suit to declare that opportunity as belonging to his company Guth contended that the 1931 opportunity was but a continuation of a negotiation begun by him in 1928 when he had yet no connection with the Loft Company. The Chancellor found that fact to the contrary and that finding was accepted by the Appellate Court. The Loft Case rests on that all important fact. The principle of law implicit in and arising from that finding is controlling here. It is clear that if in the Loft Case the 1931 opportunity had been a continuation of a negotiation commenced at a time when there was no fiduciary duty due from Guth, the result would have been different and Guth would have been permitted to retain the opportunity embraced by him. Else there would have been no point to the court's finding of fact in the Loft Case that the opportunity presented itself for the first time when he was already the president of the Loft Company. The evidence here demonstrates the following: (a) the opportunity to acquire the Canadian shares of stock came to the three Hollanders in 1922 when they secured from their father the option agreement in evidence and when they bound themselves to the payment of his annuity and to the performance of the other obligations imposed upon them by the terms of that agreement; (b) in 1922 those three individuals became the legal owners of all the Canadian stock but that that ownership was charged with the trusts expressed in the 1922 agreement and that their notice given in 1927 was merely evidence of their *Page 251 
election to substitute the stipulated sum of $50,000 as the trustres in the place of the shares of stock; and (c) that the notice in 1927 was merely a continuation of the 1922 transaction evidenced by the agreement made in that year. These findings necessarily lead to the conclusion that the right of the three Hollanders to acquire the Canadian stock is determinable as of December, 1922, without regard to events subsequently occurring and without reference to the fact that in 1925 the privately owned American company became publicly owned by the sale of 50,000 shares of its stock to Merrill, Lynch Co. and the subsequent resales by that firm to the public. In 1922 the three Hollanders owned the American company and in acquiring for themselves, individually, the Canadian stock or the option for such acquisition, there was no conflict between duty and self-interest. They were, therefore, under no duty in 1922 or at any time thereafter to offer to the American company the opportunity of purchasing the Canadian stock.
The court is not concerned with the fact that the $50,000 intended to be set up as a trust fund in lieu of the Canadian shares of stock was not actually set up as such. The only ones who might have complained of that circumstance are the beneficiaries of that trust, Philip and Monroe Hollander. No one else has an interest in that question. Those beneficiaries by formal agreement waived the failure to set up the trust fund and accepted instead the personal obligation of the three Hollanders, secured collaterally by the Canadian shares of stock. The stockholders cannot be heard to complain on this score.
An examination of the cases cited leads to the conclusion that the claim of "corporate opportunity" is best tested by the rules expressed by the text writers. In 14A Corp. Jur. § 1883 the rule is well stated as follows:
"Whether in any case an officer of a corporation is in duty bound to purchase property for the corporation, or to refrain from purchasing property for himself, depends upon whether the corporation has an interest, actual or in expectancy, in the property, or whether the purchase of the property by the officer or director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created. * * *" *Page 252 
Again, in section 1890 of the same treatise, it is said:
"When acting in good faith, a director or officer is not precluded from engaging in distinct enterprises of the same general class of business as the corporation is engaged in; but he may not enter into an opposition business of such a nature as to cripple or injure the corporation. * * *"
There is one other rule that might here be stated, one invoked by complainant and drawn from the decision of the Loft Case and those kindred to it. A director or officer of a corporation cannot use corporate assets to acquire, finance or develop his own individual business project or venture and insist that either the venture or the profits thereof are his own property. When such diversion or misappropriation of corporate assets is established, the aggrieved principal may elect either to recover the diverted assets or enforce a constructive trust with respect to the venture and its resulting profits. This rule is not peculiar to the liability of directors and officers but underlies all fiduciary responsibility.
The foregoing rules, respecting which there is almost complete unanimity in the cases, were summarized by the Appellate Court in the Loft Case when it said:
"It is true that when a business opportunity comes to a corporate officer or director in his individual capacity rather than in his official capacity, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which it has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it, if, of course, the officer or director has not wrongfully embarked the corporation's resources therein."
Tested by the several stated rules, complainant has failed to show that the opportunity to acquire the Canadian business through the acquisition of the Canadian stock was an opportunity rightfully belonging to the American company and one which the three Hollanders were not free personally to embrace. The facts clearly demonstrate that the opportunity came to them in their individual capacities and was merely an opportunity to reacquire a business founded by them even *Page 253 
before the American company was organized and in which business they had relinquished in 1918 to their father their three-fourths interest. What the parties did in 1922 was in a sense a revision of their 1918 deal. The earlier transaction was one in which Adolph bought out the interests of his sons and son-in-law; the later transaction in 1922 was one in which they bought out the interests of their father and father-in-law.
Nor was the opportunity one essential to the American company. The business of that company and its predecessor partnership had been operated within the confines of the United States so successfully that long before 1922 the American company had become the leader in this country and the largest concern of its kind in the world. This position of pre-eminence was achieved despite the fact that the American company and its predecessor partnership had never prosecuted its business in Canada or in any other foreign country. Extension of its business into foreign territory may have been desirable but certainly was not essential to its business or continued prosperity. It may well be that the establishment of branches in South America, Europe, Australia, New Zealand and other parts of the world would have been desirable as measures of expansion but it surely cannot be claimed that that was so essential to the company's business that those other fields were forbidden to the individual enterprise of the company's directors. It is not within the right of a company so to pre-empt for itself all possible fields not contemplated by its existing business and into which other fields it might never thereafter venture. The opportunity to acquire a likeness in any of those foreign countries was not in 1922 or even in 1927 essential to the protection of the company's American business. The situation may have been different with respect to France after 1930 (when the French company was organized) or with respect to England after 1937 (when the Competent Fur Dressers business was acquired) but neither of these developments had yet come to pass by 1922 or 1927 and there is no proof before me that such expansion was ever contemplated prior to the years in which it occurred. If the company could pre-empt Canada, it could pre-empt *Page 254 
every part of the civilized world in which furs are processed. A somewhat similar question arose in the case of Colorado and UtahCoal Co. v. Harris, 97 Col. 309; 49 Pac. Rep. 2d 429.
There the complainant company sought to have declared a trust upon coal lands which the company's president had acquired for himself. The company claimed that because of his fiduciary position its president had obtained knowledge of the peculiar value of those coal lands, that this knowledge had been furnished at the expense of the company and that Harris, as president and director, had committed a breach of duty in failing to give the company an opportunity of acquiring the coal lands for its own corporate purposes. The bill was dismissed and on appeal it was held that before the company could establish a trust it was first obliged to establish an interest, actual or in expectancy, in the coal lands. The Appellate Court held that the complainant company could not create a virtual monopoly of extensive fields of enterprise into which its officers and directors would forever be precluded from entering. The court said:
"Harris, as such representative, could embark upon no business which would cripple or injure his principal or acquire interests adverse to it if thereby he would hinder or defeat the very purpose of its organization. But, if he had no duty to act or contract for it with respect to the property in question, he was at liberty to act for himself. Bisbee v. Midland L.P. Co.
(C.C.A.), 19 Fed. Rep. 2d 24, 28.
"There being here no existing right, plaintiff must, and does, rely upon expectancy. * * *
"These parties are operating in a territory containing coal deposits of vast, we might almost say of unlimited, extent. Such is the condition of this record as to force the conclusion that, if plaintiff had an interest in expectancy in the property in question, it had a virtual monopoly of extensive fields into which its officers and directors were forever precluded from entering. We find in the authorities, and in reason, no support for such an extension of the doctrine of expectancy. If Harris had no duty to acquire for, or offer to, his company the property in dispute, and we think there is ample evidence to support the trial court's conclusion to the contrary, he had *Page 255 
a right to acquire it for himself. Carper v. Frost Oil Co.,72 Col. 345, 348; 211 Pac. Rep. 370.
"Even had Harris gained all his knowledge through his connection with plaintiff, and even had plaintiff been, in a general way `negotiating for and endeavoring to purchase' the interests involved, something more is required to establish the essential expectancy and bar Harris from acquiring individually.Lagarde v. Anniston Lime and Stone Co., 126 Ala. 496;28 So. Rep. 199; Zeckendorf v. Steinfeld, 12 Ariz. 245;100 Pac. Rep. 784.
"For plaintiff to prove its expectancy, which was the very crux of its case, we think it was bound to establish, not only that the properties in question possessed value to it, but that it had a practical, not a mere theoretical, use therefor * * *."
The uncontroverted testimony before me establishes that when the three Hollanders concluded their sale of stock to Merrill, Lynch Co. in 1925, they entered into employment contracts with the American company wherein they covenanted that for five years ensuing the 1st day of January, 1926, they would not engage inany business in the United States of America competitive with that of the employing company, and that this restriction was designedly confined to the United States so that they would be left free to prosecute their Canadian business. The proofs are to the effect that the territorial limits expressed in the covenant were put in as a result of the information and knowledge that Merrill, Lynch Co. had concerning the Canadian business, the operation thereof by the three Hollanders and their outstanding option to acquire personally that business by the purchase of the Canadian stock. The exaction of the restrictive covenant corroborates the exclusion of the Canadian company from the 1925 transaction.
The subsequent and continued growth and success of the Canadian enterprise cannot now be pointed to as a reason why it would have been very beneficial to the American company and its stockholders had the Canadian business been absorbed into the American company at the time of the Merrill, Lynch transaction. The company's right to the Canadian opportunity is determinable as of the time the opportunity first *Page 256 
presented itself in 1922, without reference to the changing conditions of time. In 1922 the Canadian company was a failure. In 1925 it made a net operating profit of about $33,000, in which year the American company made a net profit (after reserve for taxes) of over $800,000. The Canadian business was not considered desirable. It certainly was not then essential and has not been essential down to the present time. The almost uninterrupted record of large profits made by the American company since 1925 shows how well it has fared without the Canadian business and how nonessential that business has been to the American company's success. That record is so impressive that it merits statement here. The total net profit made by the American company from 1925 to and including 1938 was $4,463,228.78, out of which it paid dividends to its stockholders in the aggregate sum of $3,382,758.65.
Nor was the Canadian business one in which the American company had any interest or expectancy. It was no party to the option agreement of 1922 nor was that agreement taken for its benefit. The right of the three Hollanders to sell that business to their own company was a right in them which they might or might not exercise as they themselves saw fit. That right was no different than their right to sell the Canadian stock to an utter stranger. It was a right but not a duty.
There is nothing in the case from which can possibly be spelled out an existing right in the American company either at the time the option was secured in 1922 or at the time it was exercised in 1927. Cases where the company has been held to be possessed of an existing right are such as Lagarde v. Anniston Lime and StoneCo., supra, where the directors secured for themselves two interests, in one of which their company already possessed rights under a lease and contract of purchase. In the case at bar the American company possessed no right which it could have enforced either against Adolph Hollander, the grantor, or the three Hollanders as the grantees of the option. Nor did the American company have any expectancy with respect to the Canadian business. In the Lagarde Case such expectancy was defined as one "growing out of an existing right." Although the Lagarde *Page 257 Case was criticised in the Loft decision, I am constrained to regard the Lagarde Case as correctly decided and in accordance with sound principles of equity. Applying that case to the facts here, it is plain that there was no expectancy in the American company, for there was no existing right out of which that expectancy could grow. If, however, the expectancy is one not necessarily dependent upon an existing right, the result would be no different. The American company had no right to expect that if the Canadian business were to be sold by Adolph Hollander it would be sold to itself and no one else. There was no such relationship in 1922 between the American company and Adolph Hollander as furnished to the American company any moral or legal claim to be preferred as the purchaser of the Canadian business. Applying to the facts in this case the principles of law, the American company did not in 1922 or anytime thereafter possess any expectancy with respect to the ownership of the Canadian business or the shares of stock.
The complainants argue that by acquiring the Canadian business the three Hollanders hindered or injured the American company and were brought into competition with it. The facts demonstrate that the American company and the Canadian company never competed with each other. Each serviced its own separate field of opportunity without overlapping or encroachment. In point of competition, the respective fields of activity of the two companies were remote, for the proofs showed that the tariff barriers between the United States and Canada are in this field of business economically insuperable. This accounts for the fact that there has been no competition between Canadian fur dressers and dyers and those in the United States. Therefore, the purchase by the three Hollanders of the Canadian business did not create or produce the slightest competition with the American company. Nor did that purchase alter or expand the conditions prevailing at the time of the purchase. From 1917 forward, Limited has pursued its Canadian business. The purchase of its stock by the three Hollanders did not inaugurate its business or create a new situation; it merely accomplished a change in the ownership of the stock. Nor did that stock *Page 258 
purchase create a situation where the interests of the two companies might thereafter clash. The testimony is clear that Limited never once thereafter invaded the American company's field of endeavor but that, on the contrary, in 1930 the American company extended its business into France, where Limited was already doing some little business, and in 1937 extended its business into England, where Limited had been doing some business under the advantages flowing from the United Kingdom Trade Agreement of 1932 by which the Dominion of Canada enjoyed preferential tariffs at the hands of her mother country. It is also unbelievable that the individual Hollanders would have created a situation or permitted one to arise where their vast holdings in the tremendously larger American company would have been injured or jeopardized by competition from their Canadian company in which, though they owned 100 per cent. of its stock, their financial stake was relatively unimportant. Even to-day their holdings in the American company amount to 75,000 shares or thirty-five per cent. of the American company. That holding is to them of far greater value and productivity than their 100 per cent. ownership of the Canadian company. A comparison between the profit records of the two companies demonstrates this beyond all question. The acquisition of the Canadian stock by Michael, Albert and Benjamin Hollander did not bring either company in competition with the other and had no adverse effect upon the business or interests of the American company.
It is charged by the complainants that the Canadian business was developed by the three Hollanders by the employment of the funds, resources and facilities of the American company. If this were the fact, a constructive trust would be decreed in favor of the American company that the Canadian shares of stock are the property of the former. The claim, however, is wholly unsupported by proof and is based upon a misconception of the facts concerning an arrangement between the two companies for mutual aid and assistance. Those facts are as follows:
The arrangement originated in 1917, when the Canadian company was organized and several years before the American *Page 259 
company came into existence. From that time forward there existed between the Canadian company on the one hand and the American company and its predecessor partnership on the other a free and unrestricted flow of technical information and assistance. This arrangement was never evidenced by any formal written agreement but has been mutually observed for almost a quarter of a century. That reciprocal arrangement contemplated, and in practice consisted of, the exchange of formulae and working methods for the processing of furs, price information concerning chemicals and, occasionally, technical assistance in correcting production problems. Under that arrangement any formulae or other information possessed by either company was made available to the other upon demand. Only during the four years, between 1918 and 1922, when Adolph Hollander caused the Canadian company to engage principally in merchandising, was the practice of interchange of information abated. During those years the Canadian company had little or no need for technical information and had little to offer, because during those years it had virtually ceased to be a fur dressing and dyeing concern. However, when the three Hollanders acquired the 1922 option and immediately resumed the management of the Canadian business, the policy and practice of mutual interchange of information and help between the two companies was resumed and has been continued uninterruptedly to the present time.
Some of the formulae and working methods of the American company were the result of experimentation in its own plants. Some were acquired under license agreements or purchase, others by the purchase of other fur processing concerns, and many as a result of arrangements between the American company and foreign non-competing companies for exchange of formulae and trade information. The arrangement between the American and Canadian companies was not unique. The American company had similar arrangements with the firm of Wachtel and the firm of Arnhold, both being fur processing concerns in Germany, in neither of which foreign concerns were any of the individual Hollanders financially interested. Under those arrangements the German *Page 260 
concerns were furnished with any and all formulae, working methods and trade information belonging to the American company and this without the payment of any license fee or royalty. The consideration for that information and aid was the opportunity and right of the American company to receive whenever it so requested any of the formulae, methods or information possessed by those foreign concerns. This reciprocal arrangement with the Wachtel and Arnhold firms endured for about twenty years and was interrupted only a year ago by the outbreak of the present European conflict. Like arrangements were made between the American company and four other concerns in New Zealand and in Australia, evidenced by agreements which have been in effect since 1934. Those agreements call not only for mutual information and instruction but also provide for a nominal royalty to the American company, the amount being approximately $2,500 a year. The thing to be noted is that the American company had no hesitancy about furnishing even its secret formulae and working methods to concerns in Germany, New Zealand and Australia in exchange for the opportunity of securing from those foreign concerns the latter's formulae, methods and trade information. The explanation, furnished by the testimony, for these arrangements is that the information thus obtained from the foreign concerns is of incalculable importance and value to the business and success of the American company, while the information furnished to those foreign concerns results in no disadvantage to the American company, since the parties to those reciprocal arrangements do not compete with each other. The wisdom of such business policies the court will not pass upon but undoubtedly the practice would not have been persisted in for so long if it carried with it jeopardy to the American company or if it failed to produce for that company considerable advantage. Many witnesses testified to the great benefits derived by the American company from these arrangements, which testimony stands uncontroverted. The importance of the testimony concerning the interchange of information with the German, Australian and New Zealand concerns lies in the fact that those arrangements establish a general business custom *Page 261 
or policy and the testimony demonstrates that the like arrangement with the Canadian company was not one peculiar to it or the product of favor.
A great deal of evidence respecting the interchange of information between the American and Canadian companies was supplied by the defendants. By this proof it is established that the Canadian company took relatively little of value but conferred tremendous benefit upon the American company. Such preponderance of benefit in favor of the American company is hardly necessary in order to persuade me that the arrangement was fairly and honestly entered into and that the arrangement was not a subterfuge for the diversion of valuable assets and property from the American company to the Canadian company. If such arrangement be grounded in honesty and fair dealing, it matters not which of the parties to the arrangement may at any given time enjoy the greater benefits under it. It is conceivable that under such an arrangement the scales would fluctuate and that at various times one or another of the parties to the arrangement might enjoy the greater amount of advantage. Yet, it cannot be overlooked, what has been demonstrated in this case, that much of the success of the American company is due to the help and information furnished by the Canadian company and the latter's working personnel. The Canadian, Payeur, who was shown to be a technician of wide experience and creative skill, testified that the Canadian company furnished to the American company about four times as much information and help as it received. This interchange of information does not nor need lend itself to mathematical appraisal. Certain it is, however, from the proofs adduced, that the American company received over the years considerably more information and help than it ever furnished to the Canadian company. While the two companies emphasized in their business the conversion of muskrat into what is known in the trade as "Hudson Seal," that being the principal product of each company, there were considerable points of difference between their enterprises. The American company has been a specialist in its field, working on but few types of skins and making its profits through volume production, *Page 262 
while on the other hand the Canadian company has been engaged in general dressing and dyeing and processing all kinds of skins. The American company conducts its production work in various departments, spread through various plants in Newark and other cities, while Limited's dressing and dyeing is all done under one roof. Because of these differences the Canadian company has been the training school for many of the important key men of the American company. The testimony establishes that for various periods of time they received their training in Montreal under the tutelage of George Payeur, Sr., and that after such instruction they returned to the American plants, assuming charge of their respective departments. All such instruction and training was furnished by the Canadian company gratuitously.
The proofs establish that in each of the two companies the so-called "Light Goods or Fancy Colors" Department has meant little by way of profit. The American Company consistently lost money in its fancy goods department until it acquired from the Canadian company gratuitously the latter's process for mink blend on muskrat; the Canadian company succeeded in making a little profit in its fancy goods department. It is clear that with a single exception, hereinafter set forth, the American company assisted the Canadian company with corrective information only with respect to the latter's fancy goods production. On the other hand, the Canadian company's assistance to the American company related chiefly to the latter's Hudson Seal production. This alone would seem to indicate that such help as the American company received was in direct relation to its most important item of production while the help that the Canadian company received related to its fairly unimportant fancy goods production.
On several occasions the Canadian company saved the day for the American company in the latter's production of Hudson Seal. In 1925 serious trouble developed in the plants of the American company in the processing of the muskrat. The difficulty was so grave that the company was about to discontinue that item. Mr. Payeur was requisitioned from Montreal and he spent several weeks at the Newark plant showing the workingmen there just how that type of "rat" *Page 263 
(Western Canadian rat) was handled in Montreal. As a result of this help the difficulty was promptly eliminated and the American company proceeded to process that year between 600,000 and 700,000 Western Canadian "rats." The trouble thus encountered was not peculiar to the American company; similar trouble was experienced by all its American competitors who, however, were not able to overcome the difficulty. Due to the aid so furnished by the Canadian company the American company promptly met the emergency, an emergency which had cropped up at the peak of the production season. It is important to note that the method brought by Payeur from Montreal and imparted by him to the men at the Newark plants was radically different from the one theretofore employed in those plants. The net result of this help was that the American company was enabled that year to do about $300,000 of business in the Western Canadian "rat" without a reappearance of the difficulty. That problem never again presented itself.
In 1933 the Canadian company made a complete change in its method or system of handling the muskrat. In 1935 the American company again ran into some new and serious difficulty with the muskrat, and again at the very peak of its season. The American customers were dissatisfied and complained of the article. Mr. Payeur was at once summoned from Canada and he immediately installed in the Newark plant the entire Canadian method of handling the muskrat which he had inaugurated in Montreal two years earlier. That method, too, was radically different from the one then in use in Newark. By this substitution the American company avoided claims for damages and produced an article which proved acceptable in the trade. The new method proved so satisfactory that the American company gave it the trade name of "Vita Hair." The American company is still using the name and method.
In 1939 the Canadian company made some changes to the Vita Hair process. Thereupon Mr. Weiser of the American company went to Montreal to study these changes. Finding them satisfactory he brought them back to Newark and installed them in the Newark plant. These changes accomplished *Page 264 
both an improvement in the quality of the article and an economy in time of production, a labor saving of approximately two cents a skin to the American company or an average annual saving of $60,000.
Only once did the Canadian company require help on its muskrat article. In 1937 some production difficulty developed in Montreal which was solved by one of the American dyers going to Montreal and suggesting points of correction.
Complaint is made that the Canadian company was permitted to employ a secret process, known as "Hollanderizing" for the cleaning of fur garments and also to employ the trade name of "Hollanderizing." The evidence demonstrates that the process was not a secret one and in substance is known to all furriers. Even if it were a trade secret, the furnishing thereof to the Canadian company was well within the scope and spirit of the arrangement between the two companies for the interchange of all technical formulae, processes and information. While it is true that the American company adopted the name "Hollanderizing" about a year before the Canadian company adopted the same trade name, there is nothing serious in it. The Canadian company had rightfully used the name "Hollander" since 1917 and coining that name into the trade name "Hollanderizing" can hardly be regarded as a trespass. Certainly not in view of the fact that fur garments are not sent from either country to the other for the purpose of being cleaned.
There is evidence, also, of occasional assistance given by each company to the other in connection with the Hollanderizing process. Here, too, the advantage has been with the American company. Certain changes suggested and furnished by the Canadian company have resulted in a saving to the American company of $12,000 for each annual garment-cleaning season. No service of comparable value has ever been furnished to the Canadian "Hollanderizing" business. Canada's Hollanderizing business has been conducted at a consistent loss.
In 1938, one of the American company's key men went to Montreal for the purpose of experimenting there with a Persian lamb formula obtained by him the preceding year *Page 265 
from the Wachtel firm in Germany. In these experiments he was assisted by George Payeur, Jr., one of Limited's employes. The result of those experiments was a new Persian lamb formula combining within itself various parts of the German formula and the one then owned and used by the Canadian company. That final formula was brought down to the American company's plant at Middletown, New York, and put into operation. It at once resulted in a very large saving in production cost and also made for economy of factory space. Under that new formula there resulted a saving of $50,000 a year in chemicals, $7,500 a year in sawdust, $40,000 a year in labor and $4,000 a year in light, heat and power, notwithstanding a substantial increase in volume of skins processed. That new formula has meant to the American company an annual saving of more than $100,000. Furthermore, the new formula was brought from Canada at a time when the Middletown plant was facing an emergency. The Persian skins had been processed defectively and damage claims in large sums were mounting. The installation of the new formula terminated the trouble and enabled the company not only to put a stop to its flood of losses but also to regain its prestige in the trade.
In 1939 the Canadian company furnished to the American company the process of blending raccoon coats so that the latter would resemble silver fox. That item was installed in the Newark factories by Canadian employes who came from Montreal and instructed the American employes in the practical use thereof.
Perhaps the most important contribution made by the Canadian company to the American company was in 1938, when the former furnished to the latter a formula and method for mink blending on muskrat. That item had never before been produced in any of the factories of the American company but had been worked on by the Canadian company. The item was perfected in Montreal by Feldman and Payeur, two employes of the Canadian company. In 1938, Feldman and one of his assistants came to the Newark plant and there imparted to the representatives of the American company the formula and method and actually put it into practical *Page 266 
operation. They also instructed and trained the American company's men and workers in the use of the new system. That article alone has meant to the American company a profit of about $300,000 for the year 1939. From the figures in evidence it would seem that the American company has within the space of little more than a year taken virtual command of the entire American market for mink blend muskrats. At the time of final hearing, the American company's business for the first four months of 1940 in mink blend muskrat was about six to one as compared with its like business for the corresponding period of the preceding year. It is of no little importance that due to the mink blend formula and method furnished by the Canadian company the American company was able in 1939 to show for the first time a substantial profit in its Fancy Goods Department. This contribution alone appears to have been of far greater meaning and value than all the information and assistance ever rendered by the American company to Limited.
There is no support in the evidence for the claim that manpower was diverted from the American company to the Canadian company. It is true that on occasion the American company would help out by sending one or another of its men to Montreal to be of some assistance there. Those occasions are not shown to have been many or the period of assistance of long duration. On the other hand, the evidence shows that the Canadian company sent its master dyer, Payeur, and various others of its practical men to the American company's plants to help eliminate production difficulties, to install new methods, to instruct American employes and to render other services of importance. Figures of time spent are available only for the years from 1937 to 1939. It is impossible, nor is it necessary, to determine which company furnished to the other more men and more hours of assistance. Particularly is this true because most of those American employes who occasionally went to Montreal went there to secure information or receive training for the benefit of the American company. Measuring, however, the exchange of personal service by the value of the information exchanged, it is very clear that the American company received and *Page 267 
utilized many items of tremendous utility and value, while the Canadian company received but few items and these of no great economic return. The many exhibits relating to the flow of formulae between the two companies show that over the period of many years during which the reciprocal arrangement between the two companies has been in effect, the American company received from the Canadian company more than ten times as many formulae as were furnished by it to the Canadian company.
On the score of machinery furnished by the American company to the Canadian company, the latter was always at a disadvantage. It was proved that the American company made a practice of selling its old and discarded machinery to the Canadian company and charging therefor good prices. That machinery was paid for by the Canadian company at the invoice prices but rarely without complaint. Many, if not most, of the machines sold and shipped to the Canadian company were in such condition that the latter was obliged to make substantial outlay for repairs and reconstruction. There is no evidence that any of the machinery was under-priced or was not paid for in due course. The correspondence in evidence is illuminating that on the machinery transactions the Canadian company enjoyed neither favor nor advantage.
The chemicals purchased through the American company were invoiced to the Canadian company at cost and were paid for in due course. On the other hand, the Canadian company was enabled to buy certain chemicals in Canada at prices lower than what was being paid for those chemicals by the American company. Limited made those purchases for the American company, paying therefor with its own funds and merely charging the American company on the basis of cost. Thus there were mutual running accounts between the two companies which were periodically settled by payment. There can be no cause of complaint on this point.
The representatives of the two companies would occasionally exchange information concerning cost of chemicals, dyestuffs, sawdust, machinery and almost everything used in production. These occasional check-ups proved to the mutual advantage of the two companies and frequently resulted in *Page 268 
each company being able to secure a lower price for its purchase of chemicals and supplies. This is a matter of business with which the court has no concern.
Before leaving these facts, it should be mentioned that the Canadian company has for years serviced the business of the French company in Canada, making no charge for that service. It consisted of submitting samples for the French company, quoting the latter's prices and looking after its deliveries. The Canadian company's salesmen also attended to collecting accounts for the French company and settling its occasional disputes with its Canadian customers. The expenses involved in this service, such as cables to France and other items, have been borne by the Canadian company without reimbursement. In addition to the foregoing, the Canadian salesmen also serviced the American company by furnishing to it names of American buyers attending the Canadian fur auction sales. The purpose of this was to enable the American company's salesmen to follow up the prospects and secure for the American company the processing of the raw skins bought in Canada and imported into this country. All of these services are rendered to the American company gratuitously.
It might also here be mentioned that many of the formulae and much of the information requisitioned by the Australian and New Zealand concerns under their agreements with the American company for exchange of information are furnished by the Canadian company, although the latter does not participate in the $2,500 annual royalty payable to the American company by the Australian and New Zealand concerns. Such formulae and information are furnished by the Canadian company gratuitously and only because it is regarded as part of the long standing reciprocal arrangement between the Canadian company and the American company. Limited's facilities for furnishing that service to the foreign concerns have been better than those of the American company because of Limited's wider experience in all kinds of furs. This and many other instances demonstrate the meticulous attitude adopted by the American directors in their dealings between America and Canada. All transactions *Page 269 
in which Limited could have legitimately shared in the profits were resolved wholly in favor of the American company.
Complainant endeavors to have such of the various services, above enumerated, as were rendered by the American company to the Canadian company construed as acts of diversion of the assets, resources and facilities of the American company. This argument would have force only if the American company had received no consideration therefor. The contrary is the fact. The American company has received manifold recompense for all the information and other assistance rendered by it to the Canadian company. On the whole, the American company has taken under the reciprocal arrangement appreciably more than it furnished and it is vastly the gainer thereby. The reciprocal feature of the arrangement between the two companies and the benefits gained thereunder by the American company fully justified such aid and assistance as the testimony in this case shows was rendered by the American company to the Canadian company. The arrangement obtaining between the two companies for over twenty years was entered intobona fide and has during the intervening years been observed in good faith and with all honesty of purpose.
There is evidence that within recent years the Canadian company in advertising its products in the Canadian press simulated several of the trade-marks and one slogan used by the American company in its advertising literature. It was also proved that in 1938 the Canadian company adopted and used in its Hollanderizing business a tag identical with that used by the American company in its Hollanderizing business. Noticeable, however, is the fact that in all its advertising matter (excepting the tag) the Canadian company clearly and distinctly used its own corporate name with appropriate prominence to the word "Ltd." While the simulation is undoubtedly a form of plagiarism, there is no ground for complaint at the suit of any stockholder of the American company. No injury could possibly have resulted to the American company for the arrogation by Limited of several trade names and a trade slogan. Inasmuch as each company *Page 270 
serves a separate and distinct territory, there could not possibly result any confusion amongst or deception upon the trade or the ultimate consumers. No profits were diverted from the American company and the objectionable use of a few of its trade-marks and one of its slogans has been without injury to it. Counsel for the defendants attempts to justify that use as something within the scope of the arrangement for mutual assistance, but with this the court cannot agree. Yet, however objectionable the use of the trade-marks and slogan might have been, it furnishes no ground to any stockholder of the American company to lay claim to the business and profits of the Canadian enterprise. The use of the few trade-marks and the slogan since 1937 was not the basis upon which the Canadian company's business and success of the last twenty years were built. It has not even been shown that the several trade-marks and the slogan have been of any value to the Canadian company. It would seem that whatever value resulted from the Canadian advertising flowed from the use of the name "Hollander, Ltd.," which in Canada identifies the Canadian fur dressing and dyeing concern. Limited's right to the use of that name has not been nor can be questioned.
We are now brought to the subject of what are said to have been loans made by the American company to Limited. Whether these were or were not loans is one of the disputes calling for decision. Complainant contends that they must be regarded as loans because the amounts thereof were charged to Limited in an account with Limited appearing on the books of the American company. Complainant's evidence relating to these alleged loans consisted of defendants' answer to an interrogatory put by the complainant. The interrogatory asked whether the American company had loaned any money to Limited at the time of and subsequent to the incorporation of Limited. The answer to the interrogatory stated that the American company was not in existence when Limited was incorporated. (Inferentially the answer was that no money was loaned at the time Limited was incorporated because the American company was not yet in existence.) The fuller answer, however, stated that between 1929 *Page 271 
and 1937, the American company made cash advances to or on behalf of A. Hollander Son, Ltd., charging the latter with the amount of such advances, all of which were repaid. Defendants' answer to another interrogatory furnished the following record of such advances to or in behalf of Limited:
 Date of Amount of Date of Advance Advance Repayment
 Jan. 21, 1929 $1,000 June 24, 1929 Dec. 3, 1930 20,000 Dec. 29, 1930 Sept. 30, 1931 10,000 Dec. 30, 1932 Sept. 22, 1931 26,000 Dec. 26, 1933 Mar. 29, 1933 7,500 Dec. 24, 1934 Jan. 31, 1934 2,000 Dec. 26, 1934 Jan. 8, 1934 10,000 Dec. 26, 1934 Dec. 26, 1935 2,500 Dec. 21, 1936 Mar. 3, 1937 15,000 Dec. 28, 1938
It is not disputed that reimbursement for all of the foregoing was made by Limited. The contest is over the question of interest, the complainant contending that interest should have been paid on these advances. The defense is that these advances were not loans and that none of the items shown was for money passing from the American company to Limited but that all the items were merely debit entries on the books of the American company in connection with transactions intended and occurring solely for the benefit of the American company. Defendants claim that these advances did not represent moneys for which Limited ever became indebted and that therefore there can be no valid claim for interest without the presence and support of a legal debt.
The defendants were not able to furnish any details concerning any of the advances other than the last two. The first seven entries remain unexplained except as it is testified that none of the advances were for the benefit of Limited and that all of them were for the benefit of the American company. The testimony is to the effect that Limited always had ample bank credit and never required any money from the American company for the operation of its business or for the purchase of securities. This explanation carries with it conviction for two reasons. The two explained items show *Page 272 
that they represented not moneys loaned or advanced to or for Limited but moneys paid out by the American company for its own benefit and merely charged to Limited. Furthermore, a comparison between the table of advances and the schedule of Limited's profits from 1925 forward plainly indicates the improbability of Limited having needed or received the relatively small advances debited against it. For example, it is inconceivable that the Canadian company, which during 1928 made a net operating profit (after income tax deduction) of $108,000, should in January of 1929 have had to borrow $1,000 and that it should have retained that money for five months in 1929, during which latter year it made a net operating profit of $84,000. The evidence was that Limited paid no dividend until 1930 and that at the end of 1929 the net accumulated profits for the preceding period of seven years amounted to over $400,000. A company in that condition is not very likely to seek a loan of $1,000. From an examination of each advance in the light of Limited's profits for the related or preceding year, it is clear that the testimony that Limited did not need the money and did not borrow it merits credence. Then why the debits? The explanation is to be found in the character of the last two items, that of March 3d 1937, for $15,000 and that of December 26th, 1935, for $2,500.
The $15,000 item is illuminating, for it shows the readiness of the three Hollanders to make personal sacrifice and accept personal loss for the benefit of the American company. That $15,000 debit arose under the following circumstances. Herskovitz, a customer of the American company, offered it 100,000 muskrat skins for processing upon condition that he receive a quotation of five cents per skin below the price established by the American company. This would have meant a concession of $5,000. Mr. Michael Hollander refused to lower the fixed price of the American company but in order to get the business for the American company he arranged with Herskovitz that the latter should buy in the open market 1,000 shares of the American company's stock and that the Canadian company would guarantee Herskovitz against any loss. The customer, however, declined to advance the $15,000 *Page 273 
required as the necessary margin on the stock purchase. The American company furnished that $15,000 and charged it on its books as a cash debit to the account of Limited, the latter not even being the conduit for the transmission of those funds. The following year Limited paid to the American company that $15,000, although it had never received a dollar of it and although it never processed a single skin out of the 100,000 muskrats delivered by Herskovitz to the American company for processing. On that delivery the American company made a substantial profit. This is only part of the story. The shares of stock purchased by Herskovitz dropped in value and eventually were taken over by Limited at a cost in excess of $28,000 and at a loss to Limited of $22,000.
The $2,500 item is quite of the same character. Mr. Leber, counsel for the American company, went to Europe in 1935 to adjust a contract between the American company and Lindner 
Merkel of Germany. Counsel's bill for that service was $5,000. The secretary of the Hollander company thought the bill should be reduced by $2,500, but the president thought differently. The matter was solved by the American company paying Mr. Leber's bill in full and charging $2,500 thereof to Limited. That charge was paid by Limited although it had no interest in the services rendered by Mr. Leber and although neither he nor his firm had rendered any professional service to Limited since 1916. Here again a charge was made against Limited and paid by it for something which was neither a loan nor an advance for its benefit.
There are a number of other instances furnished by the evidence where in order to induce business for the benefit of the American company Mr. Michael Hollander guaranteed its customers against loss on their stock purchases and subsequently saddled those losses upon the Canadian company. In view of the illustrations furnished and the entire conduct and testimony of the witness on the stand, the court accepts his statement that none of the seven other advances represented moneys loaned to Limited or advanced for its benefit and that all the nine debits relate to transactions intended to benefit only the American company. It need only be added *Page 274 
that if the seven items, which have been satisfactorily explained by example, had remained unexplained, no interest thereon would be chargeable against the Canadian company. An allowance of interest against it would necessarily have to be upon equitable terms and one of those terms would be that of equitable set-off for the moneys that it had paid on the two known items for the benefit of the American company. The interest, if allowed on the seven items, would be comparatively insignificant and would leave the American company equitably indebted in a very large sum to Limited. The claim for interest is disallowed. That claim is also rejected as a factor in the claim of corporate opportunity. Even if all the seven advances concerning which details are lacking had in fact been loans, it is undisputed that the first of such advances was made in 1929, long after the Canadian company's business had grown and developed into one of successful operation and profit yield. Those advances, even if they had been ordinary loans, could not be and were not the means by which the Canadian business was established or developed, for such establishment and development were accomplished and completed facts long before the first of those advances was made. Therefore, there can be no application to the facts of this case of the principle advanced by complainant that where a director acquires or develops a business with the resources of his company a constructive trust arises. Considering, too, the many substantial advantages enjoyed by the American company from the aid furnished to it by Limited because of the relationship of the parties, it would have been but moderate recompense for the American company to have accommodated Limited with short-term loans without interest, had these in fact been loans. A wise policy would have dictated such accommodation to a company which had proved to be such a valuable source of assistance. Under the circumstances here present, a charge of interest would have been unconscionable.
Finally, the arrangement between the American and Canadian companies for the interchange of technical assistance and information must be regarded as a transaction between two companies having common directors. The Canadian company *Page 275 
has four directors, three of whom (the three Hollanders) are also directors of the American company, the latter having eight directors. As to transactions between a company and its own directors and as to transactions between two companies having one or more common directors, this court said, in Helfman v.American Light and Traction Co., 121 N.J. Eq. 1 (at p. 16);187 Atl. Rep. 540:
"Under ordinary circumstances, a director who deals with his corporation has the burden of sustaining the fairness of the transaction when it is attacked by the corporation, because the director is a trustee for the corporation and his dealings with his cestui que trust are regarded with suspicion. A contract, therefore, made between a corporation and a director of such corporation is voidable at the option of the corporation. Such option, however, belongs to the corporation and is not exercisable by a minority stockholder unless the contract isultra vires, fraudulent or oppressive. See Mitchell v.United Box Board and Paper Co., supra; Endicott v. Marvel,81 N.J. Eq. 378, 382, 383; 87 Atl. Rep. 230; Lillard v. Oil, Paintand Drug Co., 70 N.J. Eq. 197 (at p. 205); 56 Atl. Rep. 254;United States Steel Corp. v. Hodge, supra; Colgate v. UnitedStates Leather Co., 73 N.J. Eq. 72; 67 Atl. Rep. 657; Bingham v.Savings Investment and Trust Co., 101 N.J. Eq. 413;138 Atl. Rep. 659; affirmed, 102 N.J. Eq. 302; 140 Atl. Rep. 321; GeneralInvestment Co. v. American Hide and Leather Co., 97 N.J. Eq. 230; 127 Atl. Rep. 659; Stephany v. Marsden, supra.
"The rule that a contract between a director and his corporation is voidable at the option of the corporation has not, however, been applied to contracts between corporations having one or more common directors. Robotham v. Prudential InsuranceCo., supra; Pierce v. Old Dominion, c., Smelting Co. et al.,67 N.J. Eq. 399; 58 Atl. Rep. 319; Hyams v. Old Dominion CopperMining and Smelting Co., 82 N.J. Eq. 507; 89 Atl. Rep. 37;affirmed, 83 N.J. Eq. 705; 92 Atl. Rep. 588; Marcy v.Guanajuato Development Co. et al., 228 Fed. Rep. 150; GeneralInvestment Co. v. American Hide and Leather Co., supra."
Complainant contends that the mere presence of directors *Page 276 
on both sides of a transaction renders the transaction voidable at the instance of any dissenting stockholder. That is not the law. The rule, as gathered from the cases, is to the effect that the dissenting stockholder has no arbitrary right to avoid the transaction but has the right to subject it to the scrutiny of the court, in which event there is cast upon the company or the directors concerned the burden of showing that the transaction is fair and entirely free from fraud. Robotham v. PrudentialInsurance Co., 64 N.J. Eq. 673; 53 Atl. Rep. 842; Marcy v.Guanajuato Development Co., supra.
The directors here have sustained that burden. They proved that the transaction under consideration was honestly conceived and carried out and has at all times been fair and untainted by fraud.
Adverting to the claim of corporate opportunity, above considered, the defendants have pleaded acquiescence and laches. It has already been stated that in 1925, Merrill, Lynch Co. knew all about the Canadian option and the operation of the Canadian business by the three Hollanders. Merrill, Lynch Co. as the purchaser of 50,000 shares and the three Hollanders as the holders of the remaining 150,000 shares then constituted the entire body of stockholders. They all knew of the Canadian option and, of course, acquiesced therein. All present stockholders are possessed of derivative holdings and trace their title to the original holders of the 200,000 shares in 1925. The present stockholders are, therefore, bound by the acquiescence of their predecessors in title and are estopped from advancing the claim of corporate opportunity. Wallen v. Duro-Test Corp.
(unreported, see Chancery Docket Book 124, page 54); Trimble v.American Sugar Refining Co., 61 N.J. Eq. 340; 48 Atl. Rep. 912.
In the Duro-Test Case Vice-Chancellor Fielder said:
"Duro-Test was then a closed corporation in which neither complainant nor any member of the public was financially interested. The stockholders of Duro-Test having all assented to the several transactions with full knowledge of the facts, could not be heard to complain thereof as individuals or on behalf of the corporation (Arnold v. Searing, 73 N.J. Eq. 262;Whitfield v. Kern, 122 N.J. Eq. 332) and it would *Page 277 
seem that complainant, having acquired his stock direct from Bilofsky as hereinafter stated, would be bound by Bilofsky's assent to and approval of the transactions. Trimble v.American Sugar Refining Co., 61 N.J. Eq. 340; Hodge v. U.S.Steel Co., 64 N.J. Eq. 90; Goodnow v. American Writing PaperCo., 72 N.J. Eq. 645; affirmed, 73 N.J. Eq. 692."
In the Trimble Case, supra, Vice-Chancellor Pitney said:
"With this preliminary observation, I further remark that the bill does not state at what time complainant acquired the 100 shares of stock which he holds, and it is common knowledge that the stock of this company, and many others of the same class, is daily dealt in on the Exchange. For aught that appears, he may have acquired it a very short time before the filing of the bill, from a holder who had acquiesced in everything that the company had done up to that time and in the policy the carrying out of which the complainant seeks to enjoin. That such acquiescence would bar the original holders of the shares now held by the complainant, if he knew of it, is perfectly well settled. It is necessary, on this point, only to refer to the case of Rabe Cross v. Dunlap, 6 Dick. Ch. Rep. 40. And it seems to me that where a person holding so small a fraction of the capital stock as the complainant represents here asks to interfere with a particular phase of the management of the corporation, which is presumably satisfactory to all the other stockholders, he ought to show affirmatively that neither he nor his predecessor in title has acquiesced in the policy of which he now complains, for I think he would be bound by the acquiescence of his predecessor in title."
The complainant and the other stockholders are here bound by the acquiescence in 1925 of their predecessors, the three Hollanders and Merrill, Lynch Co., and are estopped from making the claim of corporate opportunity. This makes it unnecessary to discuss the defense of laches.
 II. THE JOSEPH HOLLANDER TRANSACTION.
There are only two claims made with reference to this transaction. The first appears in the intervenor's supplemental *Page 278 
complaint in which it is charged that the individual defendants caused A. Hollander Son, Inc., to purchase from their friends or relatives property, although the same was known to the defendants to be unnecessary, and caused the company to pay for such property sums vastly in excess of its fair value and that this was done so that their friends and relatives might profit at the expense and out of the treasury of the company. The other claim is made in complainant's brief in which it is asserted that certain advantages flowed to the Canadian company from a lease made between Joseph Hollander et al., and the Perfection Fur Dressing Dyeing Co., Inc. The first of these contentions stands completely unsupported by any proof in the case other than proof of the fact that a transaction did occur between Joseph Hollander on the one side and A. Hollander Son, Inc., on the other side and that there is a family relationship between Joseph Hollander and Michael, Albert and Benjamin W. Hollander. With respect to the second claim relating to the aforementioned lease, complainant introduced proof from which is sought to be drawn the conclusion that the lease and other features of the transaction with Joseph Hollander were designed to furnish an improper advantage to the Canadian company and that the underlying purpose was to furnish to the Canadian company an opportunity of buying at an inadequately low price property worth a good deal more, property which in the nature of the transaction should have been reserved for the American company.
These two matters call for a brief statement of the facts. Joseph Hollander, who recently died, was an uncle of the three individual Hollanders and had for a great many years been engaged in Newark in the business of dressing and dyeing furs. From about 1918 forward, he conducted his business under the corporate name of Joseph Hollander, Inc. In 1934, A. Hollander Son, Inc., brought suit in this court against Joseph Hollander and his said company, claiming that the latter were competing unfairly in the manner in which they were using the name "Hollander." The relief that was sought was to restrain the defendants there from using any name whereof the name "Hollander" would be a *Page 279 
part or, in the alternative, that the defendants be enjoined from using the name "Hollander" in such manner as to deceive ultimate consumers as to the identity and origin of their products. The matter came on before me on an application for a preliminary injunction and the suit was both prosecuted and resisted vigorously and with considerable bitterness. The proofs and briefs were voluminous and the appearances many. A preliminary injunction was allowed which was immediately made the subject of an appeal to the Court of Errors and Appeals. That court modified the restraint in some respects so that pending final hearing the defendants in that suit were restrained from using the corporate and trade name in such form or manner as might tend to confuse the buying public or ultimate consumer as to the identity of the respective products of the complainant and the defendants in the suit and the defendants were also restrained from advertising in any way their products to the buying public or ultimate consumer. As the cause was about to come on for final hearing negotiations were opened between the parties with a view to the settlement of the litigation. Conferences covering many months were had between counsel for the parties and these eventually resulted in an agreement by which A. Hollander Son, Inc. (the American company) bought out the business, good will, machinery and equipment of the Joseph Hollander company. The agreement, which is here in evidence, recites that the stockholders of the Joseph Hollander company feared the result of the oncoming trial. In that agreement is expressed their opinion that if that litigation resulted in a permanent injunction restraining the Joseph Hollander company from using the name "Hollander" or even if the litigation resulted in such restraint as forbade that company from using that name except accompanied by language clearly indicating that its products were not those of A. Hollander 
Son, Inc., the effect on the business of the Joseph Hollander company would be exceedingly injurious. Thus, the defendants in that suit admitted that their continued use of the name "Hollander" without explanatory or informative words was essential to their business. On the other hand, the complainant in that suit was not without its *Page 280 
own fears. The defendants claimed an oral license of long standing and rested also upon acquiescence and laches for a period of over sixteen years. It is not possible to say in retrospect where the proofs and the equities would have preponderated but certainly the situation was then a serious one for both companies. If the complainant had prevailed the effect undoubtedly would have been to diminish considerably the business of the Joseph Hollander company. If, on the other hand, complainant had failed to prove its grievance or if relief on account of that grievance were held to be barred either by ascquiescence or laches, complainant's business would have suffered immeasurably by that competition which complainant claimed was both unfair and most damaging. In this juncture of risk the parties composed their long litigation by the Joseph Hollander company selling out to the complainant company and going out of business. By this disposition there was eliminated from the field the only other concern in the United States engaged in the same line and bearing the name "Hollander." The litigation had lasted from August of 1934 until January of 1937 and the settlement was put into effect in the early part of 1937, at which time there was entered in the then still pending cause a final decree, by consent, by which the Joseph Hollander company and Joseph Hollander, individually, were perpetually enjoined from engaging in the fur processing business under any name or designation of which the name "Hollander" would be a part.
The purchase price for the acquisition of the business and property of the defendant company was the subject of much difference of opinion and considerable negotiation. Joseph Hollander wanted a half million dollars for his business and property, to be paid in cash. A. Hollander Son, Inc., offered initially a price of $100,000 and wanted that paid over a period of years without interest. Six months' bargaining brought the parties to an understanding. The price was fixed at $275,000 for the Joseph Hollander company's business, good will, real estate, formulae, processes, machinery and other physical assets. The sellers finally agreed to take their money over a period of nine years, without interest, but *Page 281 
on the advice of their accountants they wanted the price broken down into several items and allocated accordingly. Of that price they wanted $15,000 paid annually for nine years as rent for the plant, $7,500 annually for a like period as a royalty for the use of formulae and processes and $45,000 for the title of the plant to be conveyed at the expiration of the nine-year term of the lease. The buying company was not interested in how the purchase price was divided or allocated, providing all items amounted to no more than $275,000 and providing, further, that a nine-year period of payment, without interest, was afforded. The seller's wishes as to the breakdown were submitted by its counsel and were accepted without dispute, because it was obviously of no concern to the buyer how the seller wished to regard the various annual payments of the purchase price. The figures of the breakdown were purely arbitrary and were not intended by the parties to reflect true or market values of the items to which those payments relate. The expert testimony before me, standing as it does without contradiction, establishes that the Joseph Hollander plant was at the time worth $38,750 and was worth no more at the time of the hearing before me.
A step in the carrying out of the settlement was the incorporation by A. Hollander Son, Inc., of a New Jersey company known as the Perfection Fur Dressing Dyeing Co., Inc., all the stock of which company was taken by the former so that Perfection was and continued to be a wholly owned subsidiary of the American company. That company consummated the settlement, taking in its own name all instruments of transfer. It took in its own name the nine-year lease for the Joseph Hollander plant at a reserved net annual rental of $15,000. The gross rental for the period, amounting to $135,000, was payment pro tanto of the amount for which the parties settled. On January 2d 1937, the day when that lease was taken by Perfection, Joseph Hollander and his associates entered into an agreement with the Canadian company, which agreement has been made the basis of complainant's charge of a diversion to the Canadian company. By that agreement the factory, already leased for nine years to the Perfection company, was to be conveyed to the Canadian *Page 282 
company nine years later at a cash price of $45,000. Complainant argues that this latter agreement constitutes a breach of the fiduciary duty resting upon the three individual Hollanders and that this transaction demonstrates that in arranging for the sale of the plant to the Canadian company for $45,000 they were serving their self interest to the detriment of the American company. From the fact that the lease with Perfection called for a reserved net annual rental of $15,000, it is argued that the property was worth considerably more than $45,000, the inference being that the three Hollanders were passing on to their privately owned Canadian company a piece of property which, measured by that reserved rental, was worth much more than the $45,000 agreed to be paid therefor by the Canadian company. Yet, the complainant did not by any evidence dispute the proven fact that the stipulated rental of $15,000 was purely arbitrary and had no relation to the true rental value of the Joseph Hollander plant and that the plant was neither then nor now worth more than $38,750. This itself is sufficient to put an end to complainant's claim that the plant was to be conveyed to the Canadian company at less than its value. The contrary was proved. From the evidence it appears that a plant worth in 1937 the sum of $38,750 was to be conveyed nine years later to the Canadian company for $45,000 and this without allowance or abatement to the Canadian company for that depreciation and obsolescence which necessarily must take place in the interim of nine years. It seems that if any injury flowed from this transaction it was one to which the Canadian company was subjected, and this to the decided advantage of the American company. This is not all that may be said on the point. Complainant insists in his brief that the defendants have failed to explain why on the settlement of litigation between the American company and the Joseph Hollander company any right to purchase property should have been conferred upon the Canadian company. This contention still assumes that the transaction was one of potential benefit to the Canadian company and completely overlooks the proven values and the inescapable conclusion that the transaction was without intended benefit to the *Page 283 
Canadian company and could not operate beneficially to it. There is a deeper vice in that contention, for it overlooks the reason why the agreement of sale for the plant was made with the Canadian company and not with the Perfection company. By the testimony of the defendant Michael Hollander and of Mr. Milton Unger, who acted in the litigation as counsel for Joseph Hollander and the Joseph Hollander Company, it was proved that when the settlement agreement was about to be consummated Mr. Michael Hollander stated that he did not wish to add another plant to those already owned by the American company and for that reason the contract should be made to turn the plant over to the Canadian company. Accordingly, the agreement of sale was made with the Canadian company but in order to preserve to the American company the opportunity of acquiring the plant at the end of the nine-year period or even within one year thereafter, an option agreement was drawn between the Canadian company and the American company, dated January 2d 1937, which recites that the agreement of purchase by the Canadian company was essential to the settlement of the aforementioned litigation since Joseph Hollander insisted that the real estate, too, be bought as a part of the transaction and A. Hollander Son, Inc. (the American company), declined to purchase the plant for the reason that it did not wish to increase its fixed assets and that in that situation the Canadian company offered to help out the American company by binding itself to buy the property, although it had no need for it then and would have no need therefor on January 2d 1946, the date fixed for conveyance. The option agreement further recites that the American company might have need on or before January 2d 1947, for the property and may desire its acquisition. The agreement, therefore, furnished to the American company the option of taking over by assignment before January 2d 1946, the executory agreement to purchase the plant or, in the alternative, of actually purchasing the plant from the Canadian company at any time between January 2d 1946, and January 2d 1947, for the sum of $45,000 in cash. By force of this agreement the American company was put into the position where up to January 2d *Page 284 
1947, it could have the plant or not, as it chose, at $45,000, which sum was but part and parcel of the amount of the settlement of the Joseph Hollander litigation. It is very plain that by this transaction the Canadian company took nothing but the risk of loss. If, perchance, the property rose in value within ten years the American company could have it, for the mere asking, at the same price at which it was sold to the Canadian company and that the latter would have no alternative but to sell at that price. If, however, the property declined in value the American company was under no obligation to take it over and the Canadian company had no alternative but to keep the property for which it would have no use and which it could then only resell at a loss. To the Canadian company it was even more unfavorable than that, for under the setup the Canadian company was bound to buy at $45,000 cash by January 2d 1946, but could be required to resell within a year thereafter at the same price, thus not even receiving interest for the outlay of $45,000 of its own cash resources. This transaction was so disadvantageous and burdensome to the Canadian company and so helpful and beneficial to the American company that its inclusion in the bill as matter of complaint can be due only to complainant's lack of acquaintance with all of the facts.
The Joseph Hollander transaction is the only one presented by the evidence where the American company purchased any business or property from any relative or friend of the three individual Hollanders. There has been no substantiation of the charge that that purchase was made because of friendship or family relationship or that the property was unnecessary or that the price paid was excessive, or that the whole transaction was entered into for the purpose of furnishing profit to relatives out of the corporate funds of the American company. The Joseph Hollander litigation both in this court and in the Court of Errors and Appeals was strenuously fought and the parties were at all times truly adverse to each other. In fact, the hostility between them was so intense that, according to the evidence, the principals were not on speaking terms for years and until after a peace treaty was reached and the settlement became a reality. In the litigation *Page 285 
all parties were represented by counsel of high standing and integrity and it is unbelievable that any one of them would have participated in the litigation if it had not been genuinely adverse or if it had been merely a cloak to veil a transaction of family favor.
The litigation was conducted bona fide and the settlement which terminated it was fairly and honestly arrived at. It is also held that the transaction so far as it involves the executory agreement to sell the Joseph Hollander plant to the Canadian company was fairly and honestly entered into and for the purpose of aiding and benefiting the American company and that that transaction is unobjectionable.
 III. THE GOODMAN TRANSACTION.
The amended bill charges that the three individual Hollanders violated their duty as directors and officers in purchasing in 1925 through their privately owned Hollander Securities Co., Inc., all the preferred stock of Bertram J. Goodman, Inc., on which stock substantial dividends were paid and all of which stock was subsequently retired at a premium, the payment of which dividends and retirement was guaranteed by A. Hollander Son, Inc. It is there further charged that the dividend and retirement payments were made with the funds of A. Hollander Son, Inc., and that said purchase and the said use of said funds and the said guaranty were at the expense of and to the detriment of the Hollander company and its stockholders and, further, that the purchase of said preferred stock of the Goodman company was within the proper and legitimate scope of the business of the Hollander company. In complainant's brief, all of the foregoing is contracted into the single charge that the three Hollanders, in violation of their duties as directors, bought for themselves Bertram J. Goodman, Inc., a New York corporation, and sold it to A. Hollander Son, Inc., at great profit to themselves.
For the sake of clarity, Bertram J. Goodman, Inc., the New York corporation, will be termed "Goodman, New *Page 286 
York;" Bertram J. Goodman, Inc., the Delaware corporation, as "Goodman, Delaware;" A. Hollander Son, Inc., as the "Hollander company;" the Hollander Securities Co., Inc., as the "Securities company," and Michael, Albert and Benjamin W. Hollander as the "Hollanders."
In 1925 and for some time previous thereto, Goodman, New York, was engaged in dressing and dyeing what have been called "fancy furs." Its business was of some importance and the directors of the Hollander company were considering its acquisition. The Merrill, Lynch transaction, mentioned in an earlier portion of this opinion, had already been closed and the banker Charles E. Merrill was already a director of the Hollander company. Mr. Merrill conducted the negotiations by which the Hollander company sought to acquire the Goodman business. Those negotiations ripened into a contract executed on November 25th, 1925, between Bertram J. Goodman and his two associates (the three of them owning all the stock of Goodman, New York) and the Hollanders as the purchasers of that stock. By the terms of the agreement, those owners agreed to sell to the Hollanders all the common and preferred stock of Goodman, New York, then outstanding. The contract further provided that Bertram J. Goodman, himself, was to be restricted for fifteen years from engaging in a like business anywhere in the United States or permitting his name to be used in such business. The parties contemplated that the subject of the purchase would be turned over to a new company which the purchasers would organize to take over either the assets of Goodman, New York, or the shares of stock which were the subject of the agreement. There are other provisions in the agreement showing that the parties were then contemplating that a new company would be incorporated and that the various contracts and documents to be entered into with the individual Hollanders as purchasers would "be as of the first instance entered into with the newly organized company."
The agreement made by the three Hollanders was not made by them for themselves or their own benefit but for the benefit of the Hollander company. That was the underlying intention, for within about two weeks thereafter the transaction *Page 287 
was presented at a meeting of the directors of the company. At that meeting the transaction was outlined in detail and the terms of the agreement were reported. Those minutes show that the president, Mr. Michael Hollander, informed the directors that in entering into the Goodman agreement it was his intention to turn the purchase over to the Hollander company to be operated as a subsidiary. The transaction was formally approved by the board on January 15th, 1926, before which date, however, the Goodman transaction was concluded. A new company, Goodman, Delaware, was incorporated, with an authorized capital of $1,000,000, of seven per cent. cumulative dividend preferred stock and 2,000 shares of common stock without par value. The certificate of incorporation provides that the preferred stock is redeemable by the issuing company at any time at $105 per share. Goodman, Delaware, was the instrument by which the business of Goodman, New York, was purchased for the Hollander company at a price of about $566,000. Of that amount $500,000 was raised by Goodman, Delaware, selling to the Securities company 5,000 shares of the former's preferred stock and issuing to the Securities company 2,000 shares of its common stock. For the 5,000 shares of preferred stock the Securities company paid the full par of $500,000 but paid nothing for the common stock. Goodman, New York, transferred all of its assets to Goodman, Delaware, and was dissolved. At this point Goodman, Delaware, owned all the assets formerly owned by Goodman, New York, and the Securities company owned all its outstanding preferred and common stock. At the meeting of the directors of the Hollander company on January 15th, 1926, the directors were informed that the original idea that the Goodman business should be owned by the Hollander company could now be carried out by transferring to the Hollander company the 2,000 shares of common stock, the consideration for that transfer to be a guaranty by the Hollander company of the outstanding preferred stock held by the Securities company. The board then passed its resolution guaranteeing to the Securities company and every future holder of the preferred stock of Goodman, Delaware, the quarterly dividends of seven per cent. per annum and *Page 288 
further guaranteeing ultimate payment of the preferred stock at $105 per share.
Previously the Securities company had paid into the treasury of Goodman, Delaware, $500,000 in cash in payment of the 5,000 shares of the preferred stock. This cash was the Securities company's own money which it had borrowed from its own banks and solely on its own credit. Neither the funds nor the credit of the Hollander company was used in the purchase of the preferred stock. The repayment of the money borrowed by the Securities company from its own banks was collaterally secured by its own holdings, amongst which may or may not have been the 5,000 shares of preferred stock. There is some doubt as to whether those shares were included in the collateral, the witness Michael Hollander's first impression being that they had been so included and his final recollection being that they were not included and for a given reason could not have been included. It is not surprising that the lapse of fourteen years should dim the memory and somewhat obscure the fact. However, the matter of their inclusion or exclusion is of no importance here. Those shares of stock had been bought by the Securities company and paid for with its own money and it was entirely free to use those shares as collateral if it so chose. Even if so used, the fact remains that other collateral, owned by the Securities company, was also furnished to the lending bank, the Guaranty Trust Company of New York. The Securities company was then amply possessed of other holdings, included in which were about $800,000 of securities and other assets withdrawn at the time of the Merrill, Lynch transaction at the end of 1925. The evidence is clear that at least some of those other securities were furnished by the Securities company to its bank in connection with the $500,000 loan.
The annual meeting of stockholders of the Hollander company was held on January 15th, 1926. The minutes of that meeting show that the president's report was presented and read. It contained the statement that on January 5th, 1926, the purchase of the Goodman business on behalf of the Hollander company had been consummated. That report showed *Page 289 
that of the purchase price $500,000 was financed in the manner that I have already described. The details of that financing are fully furnished in that report and the stockholders were thereby informed that the preferred stock called for seven per cent. cumulative dividends then guaranteed by the Hollander company and that the Securities company had purchased the preferred stock at par. The report further stated that all the common stock had been transferred to the Hollander company in consideration of the latter's guaranteeing the preferred stock and that thereby the Hollander company had not been called upon to invest any money in the purchase and that the profits of the Goodman business would enure to the benefit of the stockholders of the Hollander company without the resources of that company having been sapped. Thereupon the stockholders, by resolution, directed that the president's said report be mailed to each registered stockholder. This was done in January of 1926, and all the stockholders thus had full information fourteen years ago of the acquisition of the Goodman business, the plan and means by which it was accomplished, the purchase by the Securities company of the preferred stock and the guaranty thereof both as to dividends and principal by the Hollander company. At the 1927 annual meeting of stockholders the minutes of the stockholders' meeting of January 15th, 1926, were read, approved, ratified and confirmed by the stockholders. There is no proof that a single stockholder ever objected to this transaction prior to complainant filing his bill herein. Furthermore, at numerous meetings of the board of the Hollander company from 1926 until 1935, various reports were presented relating to the business of the Goodman company. The minutes of those meetings contain notations of such reports and action thereon. Those minutes were read at each annual stockholders' meeting and in each instance the transactions of the directors for the preceding year were expressly ratified and approved by the stockholders. Then, also, in each of the years 1927, 1928, 1929, 1934 and 1935 the annual printed financial statement of the Hollander company, sent to each stockholder thereof, showed a liability of $500,000 on the preferred stock of Bertram J. Goodman, *Page 290 
Inc., accompanied by the explanatory note that that stock "is guaranteed by A. Hollander Son, Inc., as to principal and dividends." By this means, additional to those already mentioned, the stockholders' attention was drawn almost every year to the Goodman transaction and to the Hollander company's liability both as to principal and dividends on the Goodman preferred stock. These undisputed facts sustain the defenses of acquiescence and laches.
The Goodman business was gradually absorbed into the business of the Hollander company and conducted as part thereof. From that point on the liabilities of Goodman, Delaware, including its liability on the outstanding preferred stock, were met and satisfied by the Hollander company. Dividends on the preferred stock were paid and eventually the entire $500,000 issue was retired by annual redemption. The first redemption was in the sum of $60,000 and occurred in February of 1931, the final redemption of $100,000 taking place in February of 1935. No part of the issue was redeemed between 1926 and 1931. All redemptions between 1931 and 1935 were inadvertently effected at par, the Hollander company neither tendering nor the Securities company demanding the premium of $5 per share. When this deficiency was discovered in 1935, the directors of the Hollander company were of the opinion that the Securities company should receive the unpaid premium of $25,000. This was disputed by the director Criscuolo, whereupon Mr. Michael Hollander again demonstrated his fidelity to his trust by taking the position that the Securities company would not accept the premium unless and until its right thereto were passed upon in a judicial proceeding. The board then resolved to withhold payment until the matter could be adjudicated. Suit was at once started in this court by the Hollander company and the three individual Hollanders as co-complainants. The defendant was the Securities company and the bill told the whole story. The individual complainants fully disclosed their ownership of and their personal interest in the Securities company and that they were directors and officers of both companies and that with respect to the subject of the suit there was a conflict between their relation to the Hollander *Page 291 
company and their self-interest as stockholders, directors and officers of the Securities company. The bill sought an adjudication concerning the right of the Securities company to demand and collect the questioned premium on the Goodman preferred stock and prayed that if the money were not due the defendant be directed to surrender for cancellation the certificate for the preferred stock which it retained.
The bill gave all the pertinent details of the Goodman purchase, the issuance of its preferred stock, the purchase thereof by the Securities company and the guaranty by the Hollander company. The suit was actively defended and resisted by Mr. Dougal Herr, who appeared for the Securities company. Appearing with him was the dissenting director Criscuolo, who was personally heard in argument against the payment of the redemption premium. The charter of the company, the certificate of preferred stock and the Hollander company's guaranty were submitted for examination. Briefs were filed by the adverse counsel and the matter was decided on November 29th, 1935, in favor of the Securities company. That decision was to the effect that the Securities company was entitled to the premium of $25,000 on the Goodman stock and that only upon the payment thereof should the certificate of stock be surrendered for cancellation. A final decree in accordance with that view was entered on December 3d 1935. The defendants in the instant suit claim that said final decree is res judicata of the matters here complained of with respect to the Goodman transaction and they claim the benefit of that defense.
Upon all of the foregoing facts, complainant insists that the transaction was in essence a purchase by the individual Hollanders of the Goodman business and a resale thereof by them to the Hollander company at an increased price, that increase being the dividends and redemption premium which the Securities company later received on its investment of $500,000. This is plainly a misconception of the transaction. There is not the slightest bit of evidence that the venture was ever initiated by the Hollanders for themselves or with hope of profit by resale to the Hollander company. The Goodman purchase was initially conceived as one promotive of the *Page 292 
interests of the Hollander company and its acquisition was at all times and by everyone intended for the Hollander company. The individual Hollanders were the company's promoters in the transaction and merely the conduit by which the beneficial ownership of the Goodman business was transferred from its original owner to the Hollander company. All the documents bear out this purpose and the entire transaction was accomplished within a space of a few weeks. At no time did the Hollanders personally take possession of the Goodman business or operate it for their own gain. The incorporation of Goodman, Delaware, was merely the creation of an alter ego for the Hollander company, for at all times it was contemplated that the Delaware company would be a fully owned subsidiary of the Hollander company. That idea was given effect immediately by the transfer to the latter of all the authorized issued and outstanding common stock of Goodman, Delaware.
It is uncontroverted that at the time of the Goodman transaction the Hollander company's cash resources were not of impressive size. The statement as of December 31st, 1925, shows that the company had about $137,000 in cash as against which it owed the government for accrued income tax about $112,000. While it also had notes and accounts receivable of well over $1,000,000, their value or liquidity is not shown. It may well be that those other assets were needed by the company to support credit relations with its banks for its normal business operations during the year. The uncontroverted testimony shows that all the cash resources of the company were required for the carrying on of its business operations. It is that condition which moved the president of the Hollander company to say at the time, in his annual report to the stockholders, that the Goodman transaction was financed "without in any manner having sapped the resources of your company." Even if the Hollander company had possessed in its treasury the full half-million dollars needed to accomplish the Goodman purchase, it would have been quite improvident for it to exhaust all its cash and be left without working capital or be wholly dependent upon bank borrowings. At what point a company may providently and *Page 293 
safely cut into its cash resources for the purpose of expansion is one that is necessarily committed to the business judgment of its managers and the courts should not substitute their own. In the absence of fraud the judgment of the company's directors and officers is final and conclusive. There is not in the case the slightest evidence of fraud anywhere in the Goodman transaction. The way in which it was financed demonstrates that it was designed to leave the company free to use its cash resources and its bank credit for its normal business activity, at the same time furnishing to the company the opportunity of expansion upon long term credit. The facts in the case prove this, for during the first five years of the ownership of the Goodman business nothing was paid by way of the redemption of the outstanding preferred stock; and what was paid was paid only during the second five years of that ownership. Thus, for ten years, the Hollander company enjoyed all the opportunities of profit inhering in the ownership and prosecution of the Goodman business, financed by the funds and resources of the Securities company. For this the Securities company received on the preferred stock annual dividends of seven per cent. It seems to me that such a rate of return on a fixed stock investment is reasonably moderate.
The point advanced by complainant that the opportunity to finance the Goodman purchase was a corporate opportunity which belonged to the Hollander company and which it should have exercised, so as to save the dividends and premium on the preferred stock, is without merit. As has already been said, the Hollander company had not the cash for that purpose and to borrow the money might have interfered with its normal business. Had it been able to borrow the money for that purpose such borrowing would have necessarily involved the payment of interest together with the repayment of the principal within a reasonably short time, as is customary on bank loans. To have financed the purchase through stock underwriters would have entailed as was testified a very large premium to underwriters, and this on top of the usual premium carried by preferred stock to the investor himself. Such underwriting premium was saved to the company by the manner in which the Securities company advanced its *Page 294 
funds in financing the transaction. No opportunity was diverted from the Hollander company when the Securities company financed the purchase in the manner already detailed. Directors have a right to purchase and sell the shares of stock of their company, subject only to the requirement of law that when such stock is bought directly from the issuing company the consideration therefor shall be only cash or its equivalent in property or labor. When buying stock already issued the director is free to make the purchase at any price and for the purpose of realizing a profit thereon by means of the collection of dividends or a resale at a higher price or both. Similarly may a director buy the unmatured promissory notes, debentures or other obligations of his company, even at a discount, and either resell the same at a profit or hold the same for the purpose of collecting upon maturity the full amount of the corporate obligation. It makes no difference that in the instant case what the Hollanders did was not to buy the stock of the Hollander company but the stock of the latter's wholly owned subsidiary, Goodman, Delaware. The principles of law applicable to the one situation are applicable to the other. In either case the company's only interest and concern is to see that the full price for the stock should have upon its issuance found its way into its treasury. A case much in point is that of Hauben v. Morris, 5 N.Y. Supp. 2d 721, affirmed by Court of Appeals in 281 N.Y. 652. That was a stockholder's suit to reach the profits, dividends and redemption premiums received by the directors of a company as a result of their having bought up at a price below par the company's outstanding preferred debenture stock and thereafter receiving redemption payment at a stipulated premium. The lower court held the directors accountable for the profit, dividends and premium, it appearing from the evidence that the company itself had a very large surplus out of which it itself might have purchased the securities thereby earning for itself the profit and being spared the outlay of dividends and premium. In reversing the Supreme Court the Appellate Division said:
"The only question then is whether the acquisition by the appellants of the debenture stock from Markle was of such *Page 295 
a character that they should be regarded as trustees for the corporation and required to account for the profit received on the resale. Ordinarily a director may deal in securities of his corporation without subjecting himself to any liability to account for profits, for the corporation as such has no interest in its outstanding stock or in dealings in its shares among its stockholders. Bisbee v. Midland Linseed Products Co., 8 Cir.,19 Fed. Rep. 2d 24, certiorari denied, 275 U.S. 564;48 S.Ct. 121; 72 L.Ed. 428; Du Pont v. Du Pont, 3 Cir.,256 Fed. Rep. 129; certiorari denied, 250 U.S. 642; 39 S.Ct. 492;63 L.Ed. 1185. Likewise, a director may ordinarily buy at a discount the unmatured obligation of his corporation with the intention of collecting in full when the obligation matures.Seymour v. Spring Forest Cemetery Association, 144 N.Y. 333;39 N.E. Rep. 365; 26 L.R.A. 859; Glenwood Manufacturing Co. v.Syme, 109 Wis. 355; 85 N.W. Rep. 432; McIntyre v. Ajax MiningCo., 28 Utah 162; 77 Pac. Rep. 613. It follows from these principles that the appellants had the right to buy for themselves unless the circumstances imposed upon them a `mandate' to buy for the corporation. Burland v. Earle, L.R. (1902)A.C. 83. Such appears to be the settled rule of law. Bisbee
v. Midland Linseed Products Co., supra; Du Pont v. Du Pont,supra; Lagarde v. Anniston Lime and Stone Co., 126 Ala. 496;28 So. Rep. 199; Pioneer Oil and Gas Co. v. Anderson, 168 Miss. 334; 151 So. Rep. 161; Colorado and Utah Coal Co. v. Harris,97 Colo. 309; 49 Pac. Rep. 2d 429; Tierney v. UnitedPocahontas Coal Co., 85 W. Va. 545; 102 S.E. 249. * * *
"Moreover, the corporation did not have sufficient surplus with which to make such a purchase of its own stock, or at the very least such a transaction would have been highly improvident. It had no liquid assets sufficient for that purpose, but it is argued that it had other assets, consisting of good will and the shares of stock of Morris Plan Banks, the value of which had been appreciated on the books of the company to an extent which, it is claimed, would have justified the transaction. Even assuming, notwithstanding expressions to the contrary (Hill v.International Products Co., *Page 296 129 Misc. 25; 220 N.Y.S. 711; affirmed, 226 App. Div. 730;233 N YS. 784; Jennery v. Olmstead, 36 Hun 536; affirmed, 105 N.Y. 654; 13 N.E. Rep. 926), that unrealized appreciation of corporate assets based upon a proper estimate of enhanced value would have justified a purchase by the corporation of its own stock, it would have been a most improvident transaction under all the circumstances, resulting in an impairment of capital should any substantial depreciation in the value of those assets have occurred. Thus, upon the entire case, we find no dereliction of duty on the part of the appellants in acquiring the debenture stock."
See, also, Camden Safe Deposit and Trust Co. v. Citizens'Ice and Cold Storage Co., 69 N.J. Eq. 718, 723; 61 Atl. Rep. 529;affirmed, 71 N.J. Eq. 221; 65 Atl. Rep. 980.
The facts in the instant case are even more compelling in favor of the directors than the facts in the Morris Case. There the stock purchased by the directors individually was redeemed by their company four years prior to the time when the company was by its obligation required so to do and the profit there made by the directors was not alone large but speedily realized. In the case at bar the moneys of the Securities company were outstanding for ten years and the retirement premium of $25,000 was not received until after the tenth year and then only upon the Chancellor's decree directing that it be paid.
The decree of this court directing the payment of the premium to the Securities company is res judicata of the complaint here under consideration. All the facts here involved were there presented to the court in a controversy touching the very premium which complainant here says was unlawfully taken by the three Hollanders through their Hollander Securities Co., Inc. The determination that the premium was due to the Securities company necessarily involved a determination that the whole transaction, forming the basis thereof, was lawful and fair. The personal interest of the three Hollanders in the Securities company and their official connections with the Hollander company were presented to the Chancellor by the very bill of complaint, in which bill were fully disclosed all the circumstances *Page 297 
of the entire transaction. It is argued, however, that there is no identity of parties. Not so. The parties to the present suit were before the court in the 1935 cause. A. Hollander Son, Inc., nominally a defendant here but in essence the true complainant, was a party to that suit. In the absence of fraud stockholders of a company are bound by the decision of litigation in which their company sues or defends. The three individual Hollanders, defendants here, were parties in that earlier suit. If it is the notion that there is a lack of identity of parties because the other five directors, who are defendants here, were not parties to the earlier suit, then that idea is surely without merit. Those directors were merely the agents of A. Hollander 
Son, Inc., and a judgment for or against the principal binds them in their representative capacity. No liability can attach to them personally on a transaction executed by them as agents when that transaction has been judicially approved so far as their principal is concerned. Our Court of Errors and Appeals has held that an earlier judgment in favor of an agent is res judicata
of the same matter in a subsequent suit against the principal. See Carter v. Public Service Gas Co., 100 N.J. Law 374;126 Atl. Rep. 456. The converse is equally true. See, also, Lane
v. Rushmore, 123 N.J. Eq. 531; 198 Atl. Rep. 872; affirmed,125 N.J. Eq. 310; 4 Atl. Rep. 2d 55.
Although neither the original bill nor the amended bill of complaint charges any wastage of the good will acquired on the Goodman purchase, that charge is made in counsel's brief and is based upon two occurrences appearing in the evidence. About two years after the Goodman purchase that business was consolidated into and absorbed by the general business of the Hollander company. This step resulted in a very substantial saving of overhead. By this time the former customers of the Goodman company had very definitely become customers of the Hollander company and the good will of the former had become completely integrated with the good will of the latter. More than five years after the business had been acquired and more than three years after it had been absorbed into the Hollander business, thereby losing its own identity, the Hollander company by agreement permitted *Page 298 
Bertram J. Goodman and his associates to re-enter the fur dressing and dyeing business under the designated name of "Goodman George, Inc.," but under no other name containing the words "Bertram J. Goodman" or "Bertram Goodman" or "B.J. Goodman." This agreement contained certain provisions protective of the interests of the Hollander company and also preserved to the Hollander company the integrity of all trade-marks originally used by the Goodman company. For this partial release from the restrictive covenant of Goodman the Hollander company was released from employment contracts held by Goodman's associates. This resulted in a saving to the Hollander company of about $80,000 in salary. In addition to that saving Goodman actually paid a cash consideration of $75,000 for the partial release. This transaction was one of decided advantage to the Hollander company for it gained thereby about $150,000 and yielded nothing to Goodman except the right to re-enter the field under what are clearly protective limitations. There is no evidence that Goodman's re-entry into the field has adversely affected the Hollander business. The proof is that the original Goodman customers have continued to be Hollander customers up to the present time. In any event this transaction was one for the directors to weigh. This they did at their meeting on April 20th, 1931. Their business judgment will not be disturbed. Moreover, that action of the directors was ratified and approved by the stockholders of the company at their annual meeting in 1932. This I hold to constitute both acquiescence and ratification. The stockholders, with full knowledge of the facts, having taken no action since 1932 the defense of laches with respect to wastage stands also sustained.
The other occurrence was the action of the directors of the Hollander company in writing off in 1940 $460,000, representing the good will, trade-marks and formulae acquired from Goodman. The resolution directing such write-off states as the reason therefor that the Goodman formulae, trade-marks and good will had previously been absorbed and assimulated into those of the Hollander company and have been and are being put to valuable use by the latter. This action is pointed *Page 299 
to as corporate misconduct. The write-off did not alter the physical facts or affect the value of things already possessed and being utilized. It was a mere bookkeeping adjustment, and while it resulted in a shrinkage of book value of assets there was no reduction in their true value. The Hollander company has not since 1925 carried its own formulae, good will and other intangibles at any figure on its books or financial statements. There is no reason why this policy should not have been extended to the Goodman formulae and good will. Whether to make such write-off or not is a matter of business judgment, resting altogether with the directors. No irregularity having been shown, there is no reason why that judgment should be judicially disapproved.
 IV. EITINGON SCHILD TRANSACTIONS.
Eitingon Schild Co., Inc., is a New York company which has for more than twenty-five years dealt in raw furs. Its business was world-wide and consisted of the importation and exportation of skins. One of its several subsidiaries was a New York company known as the Eitingon Schild Fur Corporation. A third company, not a subsidiary, is the Fur Company's Syndicate, Inc., of New Jersey. The first of these companies will be referred to as the "parent company," the second as the "Subsidiary company" and the third as "Syndicate."
In January of 1937, the Hollander company ventured into the merchandising field. It made a written agreement with the Subsidiary company by which a joint venture was created. Under the terms of that agreement, the Subsidiary was to purchase muskrats and the Hollander company was to advance the required money. The merchandise was to be sold by the Subsidiary under conditions which would assure to the Hollander company the business of processing the skins. All merchandising profits were to be shared equally but all losses were to be borne by the Hollander company alone. All credit *Page 300 
risk, however, was to be borne by the Subsidiary. The agreement provided that the venture was to be terminated on December 15th, 1937.
The underlying reason for the agreement was the need of the Hollander company for a substantial increase in the volume of its muskrat department during such periods as that department was not functioning at capacity. It was believed that the arrangement would result in an increase in the Hollander company's business of 350,000 skins and would eliminate its unbalanced production of muskrats. This expectation was fully realized and the Hollander company received and processed those skins. However, before the venture got under way, an important revision in its terms was made. The Hollander company in discussing the proposition with its banks was experiencing some difficulty with them in arranging for the necessary credit to finance the venture. The banks at the outset were not in accord with an agreement where the risk of loss rested entirely upon the Hollander company. In order to meet the situation Syndicate furnished its indemnity agreement which provided that if the joint venture should result in a loss, that loss would upon demand be repaid to the Hollander company by the Syndicate company. Thus, the risk of loss was transferred from the shoulders of the Hollander company to those of the indemnifying company. The Syndicate company was at that time worth $3,000,000, over and above all its liabilities. When this indemnity agreement was obtained, the Hollander company was able to secure from its New York banks the required line of credit to finance the joint venture.
The joint venture before being entered into was submitted to the directors of the Hollander company, who approved thereof. The venture was then launched but it met with eventual loss due to the collapse of the fur market, which followed closely the general economic decline of September, 1937. Both the Subsidiary company and the Syndicate company suffered heavy losses in inventory and in bad accounts. The joint venture came in for its share of the debacle. Towards the enterprise the Hollander company had advanced $600,000, of which $250,000 was repaid during 1937. *Page 301 
Another $150,000 was evidenced by three notes of the Subsidiary company, which notes were subsequently paid by the Syndicate company, thus reducing the Hollander company's investment in the joint venture to $200,000. To this last figure must be added $166,834.39 for unpaid processing charges. The account showed on December 31st, 1937, a balance due the Hollander company of $366,834.39. Its liability in that amount was acknowledged in writing by the Syndicate company on January 13th, 1938. Complainant contends that by accepting the liability of the Syndicate, the directors of the Hollander company illegally or improvidently released the Subsidiary company from liability for the full $366,000 (round figures). The documents in evidence do not show that the Subsidiary company was ever, in fact, under any personal liability for any part of the $600,000; only the venture was accountable for that. The Subsidiary company was, however, liable for the processing charges of $166,000, which liability Syndicate took over. Only to that extent can it be said that the Subsidiary company was released. That release occurred, however, under circumstances which were designed to improve enormously the chances of the Hollander company receiving payment in full not alone of its $200,000 capital investment but also its processing charges. In December of 1937, the Hollander company was asked to yield $25,000 as an arbitrary allowance, this being but a part of its profits embraced in its processing charges. Business conditions having become extremely bad, Hollander feared that its unpaid account resulting from the joint venture might prove uncollectible unless secured in some way. Hollander therefore granted a $25,000 credit allowance but on the condition that Syndicate furnish satisfactory security for the entire balance of $366,000, being the balance after the credit allowance. This was carried out and Syndicate furnished early in 1938 to the Hollander company the following collateral, shown by the evidence to be then worth the following sums:
(1) All the stock of the Palmer Hill Holding Co., which then owned and still owns unencumbered real estate of the established value of $175,000. That company has no liabilities other than one, which, too, was *Page 302 
assigned by the creditor to the Hollander Company. The evidence shows that the company's property is at the present time worth $145,000 but its value must be considered as of the time when the security was furnished. That value is found to be ........................................ $175,000.00
(2) Short term instruments of indebtedness due from the Republic of Poland in the principal sum of $189,586.60. These obligations called for interest at three per cent. per annum, payable semi-annually. The instruments are essentially promissory notes from the Government of Poland payable to the Bank of Manhattan and transferred in blank to the Hollander Company. Upon these obligations Poland regularly paid the stipulated interested until shortly before it was invaded ...... 189,586.60
(3) The bond and mortgage of the Retlaw Realty Corporation for $60,000. On this item Hollander actually realized $40,000 in cash during 1940. There being no evidence as to what that mortgage was actually worth in 1938, the Court attributes to it a value equal to what was ultimately realized thereon in cash, viz. .............................. 40,000.00 ___________ Total value of the collateral when furnished in January of 1938 ............................. $404,586.60
As part of the transaction by which collateral was taken, the Hollander company granted to Syndicate an extension of one year to pay the indebtedness. During that year Syndicate paid off in cash the aforementioned three notes held by the Hollander company aggregating $150,000. A second extension for another year was requested and granted. No further payments were made by Syndicate other than $40,000 on the Retlaw mortgage. The present unpaid balance amounts to $326,000. As against this amount the company holds the Palmer Hill stock and the Polish government obligations. In 1940 the Hollander company wrote the indebtedness off on its books but, of course, retained and still holds the collateral.
What is wrong in the transaction? There was nothing wrong in the company's going into the venture, for under its certificate of incorporation it had the right so to do and its doing so was for the purpose of stimulating the company's business opportunities and activities. Engaging in that single venture did not change the essential character of the company's *Page 303 
business. Although it had on one or two previous occasions made the representation that it did not buy or sell furs but was essentially a service company, that statement was true when made and did not carry with it the assurance of an unalterable intention. The managers of a business company are free to change its policies, providing they keep within the company's charter powers and do not change the essential character of the business upon which the stockholders have embarked their investments. For the year 1937, being the year in which the joint venture occurred, the Hollander company's income from processing service amounted to almost $5,000,000. So it can be seen that that single venture represented only about twelve per cent. of the company's normal activities.
Nor is there ground for criticism in the releasing of the Subsidiary company from its liability for the processing charges of $166,000 and in accepting the substitute liability of the Syndicate company. Judged by the events of 1938, that substitution might well be regarded as a wise move. The substituted debtor was then in a position to furnish collateral worth at the time considerably more than the entire $366,000. Moreover, during 1938, the Syndicate company was in such condition as to be able to pay off the three notes of the Subsidiary company amounting to $150,000. The position of the Hollander company was improved both by that payment and by the collateral furnished to it. Yes, the Republic of Poland is now a conquered nation and its obligations are presently uncollectible, but no one excepting a prophet could have foreseen or predicted the events of the present war which broke out almost two years later. Persons of the utmost degree of intelligence and prudence failed to foresee the events that now distress the world. Wisdom after the event is not a fair or just test of responsibility. The action of the directors must be tested as of the time that action was taken. That is the standard of the cases. The Polish government's obligations were fully worth $189,586.60 when they were furnished by the Syndicate company. With that in mind, the entire security now held by the Hollander company amounts to about $365,000 as against a balance *Page 304 
indebtedness of $326,000. How long that collateral should continue to be held and when, and under what circumstances it should be sold are matters entirely within the honest business judgment of the directors and the court will express no view thereon.
There exists a dispute in the testimony with respect to a translation of the Polish instruments of indebtedness. The question was whether the Polish government's obligations were payable to the Bank of Manhattan or at that bank. Complainant argued that if those obligations were payable at the bank the instruments lacked the designation of a payee and could not therefore be transferred by the Bank of Manhattan. Even if the instruments were as complainant translates them they were still capable of transfer as bearer instruments. However, the evidence of the expert Lorenz is persuasive of the fact that the instruments were made payable to the Bank of Manhattan. Complainant also contends that those instruments were incapable of transfer by the Bank of Manhattan because of a restriction expressed in the instruments themselves. That restriction provides that the Polish government's evidence of indebtedness "May be transferred only after prior consent of the Minister of Communications as to the person of the transferee." Admittedly no such consent was secured to the transfer by the Bank of Manhattan and complainant argues that the Hollander company took nothing by that transfer. This point is lacking in substance, for if the transfer from the Bank of Manhattan was ineffectual to vest legally in the Hollander company the title to the instruments then that title and the benefits thereof remained in the bank. The bank's assignment would, however, unquestionably operate as an assignment of its right, title and interest and it would in equity be deemed a trustee for the Hollander company of all principal and interest received under the Polish government's obligations.
The $25,000 credit allowance already mentioned is viewed by the complainant as an illegal gift. It never was intended as a gift; it never was that and, tested by the undisputed facts in the case, it constituted a rather nominal consideration for a substantial advantage. It was the inducement to the *Page 305 
furnishing by Syndicate of the collateral, something that it was not obligated to do. The entire Eitingon Schild transaction would probably have met with no challenge from complainant were it not for the fact that he learned that the defendant Michael Hollander had been a director in the parent company until 1932 or 1933 and that he had been a director and vice-president of the Syndicate company from 1934 until 1938. The first of these connections is entirely meaningless, for Mr. Hollander's directorship ended four or five years before the joint venture was launched. His office in the Syndicate company is not persuasive towards any finding of a conflicting self-interest. In the Syndicate company neither he nor any member of his family ever owned any stock. It has been suggested that he must necessarily have owned a qualifying share but if this ever was the fact it was an ownership without a beneficial interest. It may, however, be the fact that his connection with the Syndicate from 1934 to 1938 was a factor first in that company's becoming indemnitor and then a year later putting up its own holdings as collateral. This is, however, something of which the stockholders of the Hollander company can hardly complain, for that company was the recipient of the benefits, not the donor. Considering the matter, however, as a transaction between two companies in which Mr. Michael Hollander was a common director, merely advances the cause to the point where the inter-company transactions are scrutinized by the court and where the burden is on the defendants to show that the transactions were fair and free of fraud. That burden has been fully carried and it is found that all the transactions here considered, consisting of the entry into the joint venture and its other phases already mentioned, were entered into and carried on in good faith and with the honest purpose of serving the interests of the Hollander company.
The facts before me bring these matters well within the rule laid down by this court in Ellerman v. Chicago JunctionRailways, c., Co., supra, where it is said:
"Individual stockholders cannot question, in judicial proceedings, the corporate acts of directors, if the same are within the powers of the corporation, and, in furtherance of its purposes, *Page 306 
are not unlawful or against good morals, and are done in good faith and in the exercise of an honest judgment. Questions of policy of management, of expediency of contracts or action, of adequacy of consideration not grossly disproportionate, of lawful appropriation of corporate funds to advance corporate interests, are left solely to the honest decision of the directors if their powers are without limitation and free from restraint. To hold otherwise would be to substitute the judgment and discretion of others in the place of those determined on by the scheme of incorporation."
See to the same effect Helfman v. American Light andTraction Co., supra.
 V. THE MIDDLETOWN LEASE.
In April, 1936, the Hollander Securities Co. (being an investment company wholly owned by the three Hollanders and members of their families) leased to A. Hollander Son, Inc., a plant in Middletown, New York, together with the machinery and equipment thereon contained. In stating the facts the same designations will be used as were employed in the discussion of the Goodman transaction. The lease was for a term of five years at a reserved net annual rental of $5,000. The Hollander company took possession of the plant where it conducted its Persian lamb processing. When the term had run about two and one-half years active operations were discontinued and not resumed. Complaint is made that notwithstanding such cessation the Hollander company continued to pay the reserved rental. Complainant insists that because the three Hollanders were directors on both sides of the inter-company lease transaction, that lease is voidable. The relief sought is that the lease be set aside and the defendants compelled to account for the value of such renovating as the tenant company did in the premises and for the value of all the machinery which the tenant company installed in the plant, with a credit to the lessor company for the reasonable rental value of the plant only during such time that the Hollander company was actually operating it. *Page 307 
The leased plant and machinery represented to the lessor company an investment of about $100,000 and had been owned by that company since 1925, although the legal title was not passed to it until 1931. From 1930 to 1933 the property was rented at $6,000 to $7,000 a year. It was vacant in 1936 when it was leased to the Hollander company. There is no evidence before me as to the value of the plant and machinery in 1936 but it is fairly inferable that both were in a usable condition, since both had been rented only about two years before. Undoubtedly the building and machinery had depreciated over the years and were not in 1936 worth the $100,000 that they had cost. There is, however, the uncontroverted testimony of the witness, Michael Hollander, that the $5,000 net rental reserved in the lease was a fair rental. This testimony was objected to, not because of any alleged lack of competency on the part of the witness but because the fact was elicited by a leading question and one that called for a conclusion. That objection was overruled. The witness' forty-five years of experience with fur factories and machinery show that he is qualified. Aside from this, the other evidence on this transaction convinces that the rental was a fair one. No attempt was made by the complainant to disprove the testimony on this point. Therefore, the transaction cannot be regarded as objectionable on the question of the rent reserved in the lease.
The lessee company was justified in paying and the Securities company was justified in taking the rental payments after active operations were discontinued. That stoppage came about as a result of the development of the Persian lamb formula, evolved in the Montreal plant of Limited and furnished to the American company gratuitously. Up to that point, the Hollander company had found it necessary to operate two separate plants in Middletown; the new formula made possible all operations in one plant. Hence, at the end of 1938 there was no further need for a second plant in Middletown, although it is suggested in the testimony that due to increased volume the need for that second plant is likely to arise in the near future. Under these circumstances, the Securities company was under no duty to release its tenant *Page 308 
from its obligation to pay rent for the residue of the term and there was no unfairness on the part of the tenant in continuing to honor its fair and legal undertaking.
The circumstance of there being in the transaction directors common to the two companies has been fully considered in connection with all the other proven facts and there is found in the transaction no fraud or unfairness.
 VI. LOANS FROM WELFARE FUNDS.
At the beginning of 1940, the defendants Albert Hollander, Herman A. Fenning and Joseph G. Weiser were respectively indebted to a certain fund (referred to in the pleadings and briefs as "Welfare Fund") in the sums of $11,047.29, $5,845.89 and $8,132.13. Complainant claims that these were loans of corporate funds made to directors and that all the directors should be held accountable therefor. The defendants claim that these were not corporate funds but were funds borrowed from a separate and dedicated trust fund, in which only the employes of the company are interested. Furthermore, the defendants proved that these loans were being paid off in installments and that their full payment is expected by the end of the present year. The main question presented is whether these loans were made of corporate funds or not.
In 1918 the Hollander partnership established what has ever since been known as the Welfare Fund, the purpose of which was to furnish free of charge to the company's employes sick benefits, medical attention, life insurance and other advantages. Thereafter, each year the partnership and later the company transferred to a separate Welfare Fund five per cent. of the company's annual payroll. The moneys were actually drawn out of the corporate treasury and deposited in a separate bank account. When the partnership was converted into a company in 1919 that fund had an unexpended balance of $9,000 which the partners did not consider their own and which they therefore did not withdraw. When the company ceased to be privately owned the Welfare Fund had an unused surplus of about $59,000, which fund is not *Page 309 
reflected in any of the supporting financial statements annexed to the Merrill, Lynch agreement. The three Hollanders did not withdraw that surplus. They were advised by counsel that the moneys constituted a trust fund. Many loans were thereafter made out of the Welfare Fund to other employes, some of which loans have not been repaid but those are not made the subject of any claim. Complainant has confined his grievance to the three loans above specified, made to those employes who were also directors.
In further support of their claim of a trust fund, the defendants proved that the annual corporate contributions to that fund were deducted as a company expense and that such deduction was recognized and allowed by the federal income tax authorities. Contrary to the defendants' position, the complainant points out that in certain years unexpended balances in the Welfare Fund were returned by Welfare to the corporation and it is argued that, therefore, the funds at all times possessed corporate character and identification.
The question as to whether or not a trust fund exists has been rather troublesome. The restoration in certain years to the corporate treasury of unused Welfare money might appear to be inconsistent with the idea of a dedicated trust fund. On the other hand, such restorations may be viewed as a breach against the beneficiaries of that fund. On a consideration of all the proof, the conclusion is reached that what the founders originally contemplated and what was actually inaugurated was a special trust in favor of those persons who were employed by the company. The structure presents all the elements of a trust, theres being the moneys as they reached the treasury of the Welfare Fund and the beneficiaries thereof being the company's employes. The parties themselves so regarded it, else the individual Hollanders would have been entitled to withdraw the $59,000 of their money remaining unexpended when their privately owned company became publicly owned in 1925. The loans made from that fund could not, therefore, and did not constitute loans by the company to its directors and the company's stockholders are without ground of complaint. The only ones who might complain, if the loans had been made without their approval, *Page 310 
are the employes who as a class might demand repayment at once if dissatisfied with the manner in which those three loans are presently being repaid. Similarly might they complain of the moneys taken from that trust fund and returned to the corporate treasury, for to the extent of such returns the trust fund was depleted and its intended benefits curtailed.
Even if it were determined that a trust situation does not exist, the complainant would still be without right to relief. If the court regarded the loans as having been made by the company and decreed their repayment, that relief would be granted only upon equitable terms. The Hollander company, for whose benefit complainant seeks equity, would be compelled to do equity. Of necessity that would call for a repayment by the company to the three Hollanders of the $59,000 of their money which they deposited and left with the Welfare Fund in the belief that those moneys were dedicated to the uses and benefits of the employes, not the stockholders. To undo the entire setup, such undoing would have to be by means fair to everyone and confiscatory of no one's property. In their answer to the amended bill the defendants say that if they are to be subjected to any liability with respect to the administration of the Welfare Trust Fund, then such liability should be decreed upon the equitable term and condition that the defendants have and receive credit and off-set to the extent of $60,000, or so much thereof as is equal to the amount of any liability imposed against them. The $60,000 figure stated in the answer is not quite correct; the amount of the unexpended balance left by the three Hollanders was $59,108. In their brief, the defendants assert that while they claim the right of equitable set-off, they do not seek any affirmative money decree. That claim of equitable set-off could not be disregarded were the defendants directed to account for the $25,000 loaned to the three directors above-named. Ordinarily, the allowance of that set-off would result in a decree that the company pay to the three Hollanders the difference of about $35,000. The waiver of the right to such difference merely means that the loans and the limited set-off claim would counter-balance each other and nothing would be due the company. Therefore, under any aspect of the case the loans *Page 311 
in question do not entitle either the company or complainant, suing in its behalf, to any relief.
All but $2,000 of the $25,000 loaned to the three directors was barred by the statute of limitations. The defendants point this out in their answer, saying, however, that they do not intend to set up or plead the statute and disclaim such purpose and further say that it is the intention of the indebted persons to continue the payments being presently made by them and by such payments to discharge the barred debts by the end of 1940. Complainant, on the other hand, argues in his brief that the right of equitable set-off with respect to the $59,000 is not available to the defendants because of the operation of the statute of limitations. That is not the case. The set-off having been claimed in the defendants' answer, it constituted an affirmative defense to which complainant might have by special replication pleaded the statute. No such plea was ever filed and therefore the statute was waived. With respect to the statute of limitations as a defense to a claim of set-off, the same rules of pleading are applicable as govern the like defense by a defendant to a complainant's demand.
Apart from what has already been said with respect to the status of the Welfare Fund as a trust, and leaving aside the doctrine of equitable set-off and the necessity of pleading the statute of limitations, the whole problem of the Welfare Fund may be disposed of by again referring to the 1925 transaction between the wholly-owned American company and Merrill, Lynch Co. The evidence discloses that the buyer did not consider the Welfare Fund as an asset of the corporation for there is clearly enumerated what specific assets the buyer was designating as corporate property. The $59,000 Welfare surplus was not within the enumerated assets. Nor was it within the specified assets to be withdrawn from the company. Buyer and seller both agreed that the Welfare Fund was neither corporate nor private and they dealt with it thereafter as a separate dedicated fund. Under the cases heretofore cited, the complainants are bound by the acquiescence of their predecessors in title. Furthermore, the court will give effect to the parties' own interpretation of the character of the Welfare Fund. The complainants have not established a cause of action with respect to the Welfare loans. *Page 312 
 VII. SALARIES AND MISCELLANEOUS.
The amended bill charges the payment of excessive salaries to the defendants. No proof was offered in substantiation of this charge and after the close of the case complainant's counsel stated on the record that the salaries were not being challenged except the payment of salaries to the defendants Benjamin W. Hollander and Albert Hollander during the period that they had not actually rendered services. This had reference to the period of their illnesses. At the time of the final hearing each of those persons was absent from his work, having been ill since 1939. The evidence shows that Albert Hollander was absent on sick leave granted to him by a vote of the board in July or August of 1939 at a reduced salary of $12,000 per year. Until then the salary paid him was $36,400 per year. Benjamin Hollander became ill in November of 1939 and had not yet returned to work in April of 1940. There is nothing wrong in a board of directors granting temporary leave for the cause of illness to a valuable employe of long service. Both of these men had served the enterprise in important positions for considerably more than thirty years and had contributed greatly to its growth and success. They merited that consideration and treatment which the world over is exhibited by enlightened employers towards old employes stricken with illness. Their indisposition has not been shown to be of any permanent nature and the matter of paying them during their period of convalescence was a matter of policy resting in the honest judgment of the board of directors. There is no valid grievance here.
Certain employment contracts between Competent Fur Dressers, Inc. (a subsidiary of the Hollander company) and three of its managers are questioned by the amended bill of complaint. It is charged that under a contract the Hollander company obligated itself for the payment of approximately thirty per cent. of the profits of the Competent company to certain individuals who had no lawful claim thereto and that the Hollander company was entitled to all of the profits made *Page 313 
by the Competent company. The contract itself was put in evidence but the court does not find this item of complaint discussed in any of the briefs of counsel. It may have been intentionally abandoned but that will not be assumed to be the fact; it may have been overlooked. This makes it necessary to state briefly the facts to which the complaint relates. Messrs. Reiffel, Tilhany and Hadgeoff were the owners (through stockholding) of the Competent business before that business was acquired by the Hollander subsidiary. That business was acquired by the payment of $10,500 for its fixed assets, the price representing the depreciated value of machinery and fixtures. Nothing was paid for good will or formulae. The transaction contemplated, however, that the business would be continued to be managed by the same three persons at a salary of $10,000 per year each, plus one-ninth of the net profits of the Competent business. The agreement so provides. This transaction turned out to be one of great profit to the Hollander company. The first year (1937) that it was in effect the Competent business yielded a net profit of about $40,000 after the payment of salaries and participation percentages to its three managers. For the year 1938 such net profit was over $22,000 and for the year 1939, $41,000. Thus, on a purchase price of $10,500 the Hollander company earned from its Competent business, for the first three years, net profits of more than $100,000, and this after paying the participation rights provided for in the contract. There is nothing here that warrants criticism. The transaction itself was well within the field of the company's activities and the action of its directors and officers in effectuating it not only was intended to promote the company's opportunities of profit but had that immediate effect since in the very first year the company received back its investment fourfold.
It is claimed that the board of the Hollander company has been dominated by the three Hollanders. Unless that fact is to be inferred from the mere circumstance that the three Hollanders were the chief developers of the company's business, are the seniors in point of service and are men of wide experience in their industry, as shown by the testimony, there is no evidence to support the charge. In the main, the testimony *Page 314 
in this case, is that furnished by Mr. Michael Hollander. He was completely responsive, fair and co-operative and at all times seemed to evince a desire that the defendants' conduct be thoroughly probed, unprotected by any technical rules of evidence. It is easily understood that his position and personality have made him a commanding figure in his company and that his fellow officers and directors respect his business judgment. This, however, does not spell out that domination which the cases deem objectionable. There does not appear in the evidence a single instance where any of the three Hollanders imposed their will against the judgment of their co-directors.
The fact that complainant's interest and the holdings of the three intervenors show a combined holding of less than one-half of one per cent. in the Hollander company cannot be overlooked, in view of the fact that the holders of more than ninety-nine per cent. of the company's stock failed to accept what was tantamount to an invitation to join the complainant and help redress the wrongs complained of. The reasonable inference is that more than 1,000 other stockholders do not consider themselves aggrieved and are not intrigued with the benefits which complainant seeks to obtain for them. See Helfman v. American Light and TractionCo., supra.
The defendants in their answer stated that as directors of the company and also in their various other capacities they have always served the company with fidelity and discharged their duties honestly, loyally and impartially and with due regard at all times to the rights and interests of the company and its stockholders. That answer stands fully substantiated in the record of this case. The evidence shows that in order to retain and enlarge the business of A. Hollander Son, Inc., and in order that it retain the good will and patronage of its customers, the defendant Michael Hollander personally loaned his own funds and furnished his own guarantees to aid those customers and in doing so he personally risked about half a million dollars and as a result actually sustained personal losses of more than a quarter of a million dollars. Furthermore, the three Hollanders voluntarily reduced their *Page 315 
salaries from $52,000 for the year to $26,000 at a time when they held enforceable contracts for the larger remuneration. These acts are illustrative of that loyalty and devotion to corporate interests displayed by those persons during their long connection with the Hollander company.
The charges of the amended bill and the supplemental complaint not having been substantiated and the defendants having satisfactorily explained all the transactions called into question, and the court being satisfied that those transactions were attended by honesty and good faith, the amended bill and supplemental complaint will be dismissed. Present decree. *Page 316